**ADAMS DAIRY, Inc., a corporation,**
**Appellant,**

v.

**Patrick J. BURKE, Reed J. White, Charles Speickerman, Thomas Conroy, Walter Bush, Robert A. Stewart and Fackney L. Smith, individually and as officers and members of Milk Wagon Drivers and Inside Dairy Employees, Union Local 603, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL and as representatives of the class consisting of the members of Milk Wagon Drivers and Inside Dairy Employees, Union Local 603, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, and Local 603, Milk Wagon Drivers and Inside Dairy Employees Union, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, and John Doe and Richard Roe, and Maury E. Rubin, doing business as St. Louis Labor Tribune, Respondents.**

No. 44965.

Supreme Court of Missouri.

Division No. 2.

July 9, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 10, 1956.

J. Leonard Schermer, Elmer Price, St. Louis, for plaintiff-appellant.

Harry H. Craig, Norman W. Armbruster, St. Louis, for respondents, Wiley, Craig, Armbruster, Schmidt & Wilburn, St. Louis, of counsel.

STOCKARD, Commissioner.

This suit was filed in the Circuit Court of St. Louis County, Missouri, by plaintiff, a corporation engaged in processing milk and selling the milk and milk products exclusively at wholesale to retail stores in the St. Louis area, to enjoin certain acts of

the defendants alleged to constitute an illegal conspiracy designed to injure and destroy its business, and for damages alleged to have been caused to its business by such acts.

The defendants, except Maury Rubin, are members, officers and agents of Local 603, Milk Wagon Drivers and Inside Dairy Employees Union affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL. The action is brought against Local 603 and the above named defendants individually and as a class. Maury Rubin is the sole owner and publisher of a weekly newspaper published in St. Louis known as the St. Louis Labor Tribune.

The parties agreed to try together the issues on both the temporary and permanent injunction, and it was stipulated that the portion of plaintiff's petition relating to damages would be reserved for later hearing. At the conclusion of the evidence the trial court dismissed "so much of plaintiff's petition as seeks equitable relief" and plaintiff has appealed. Our appellate jurisdiction is invoked on the ground that constitutional questions are involved under the First and Fourteenth Amendments of the United States Constitution, and Missouri Constitution of 1945, Article I, section 29, V.A.M.S.

Plaintiff's employees may be divided into three groups: (1) inside workers and clerical employees, (2) ice cream wagon drivers, and (3) milk wagon drivers. From the time plaintiff entered business in the St. Louis area and until July 1954, Local 603 was the recognized collective bargaining representative for each of the three groups, and plaintiff and Local 603 had a contractual relationship covering each group. In 1954 plaintiff and Local 603 entered into contracts for the first two groups named above, but some of the employees in group 3 formed an organization known as the "Independent Wholesale Dairy Products Salesmens Association," hereafter referred to as the "independent union" which submitted a petition to the National Labor Relations Board, hereafter referred to as "N.L.R.B.,"

requesting certification. The N.L.R.B. conducted an election, to which Local 603 and plaintiff consented, and the independent union was selected by a majority of the employees in group 3. Immediately after the result of the election was known, Local 603 filed charges with the N.L.R.B. alleging that plaintiff had engaged in unfair labor practices in violation of Section 8(a) of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq., hereafter referred to as the "federal Act," in that it had coerced and intimidated its employees to support the independent union. These charges were subsequently dismissed by the N.L.R.B. after being "carefully investigated and considered" for the reason that there was "insufficient evidence of violations." The N.L.R.B. certified the independent union as the exclusive collective bargaining representative for all the employees in group 3 and plaintiff entered into a contract with that union.

The defendants pleaded, and at the hearing the officers of Local 603 testified, that the certification by the N.L.R.B. of the independent union is not being challenged, that Local 603 does not claim to represent plaintiff's employees in group 3 for any purpose, that since the certification it has not requested or demanded of anyone that Local 603 be recognized as the collective bargaining representative for said employees, and further that the defendants have not requested or demanded of plaintiff, or anyone else, that plaintiff's employees in group 3 be coerced into joining Local Union 603.

A short time after the above mentioned certification by the N.L.R.B. of the independent union, the executive board of Local 603 authorized and directed the distribution by members of the union of pamphlets worded as follows:

"Do Not Buy
Adams Dairy Company Products
When You Patronize This Store
This Is Why

"The Dairies of Metropolitan St. Louis listed on the reverse side of this pamphlet are the finest in the world and some of them

supply this store with their products. Those Dairies employ members of our Union for the delivery of their products and grant our members good wages, hours and working conditions. We are anxious to advertise this fact to the public and to urge the people of the St. Louis area to favor those Dairies with their business.

"There is nothing wrong with the products of the Adams Dairy Company. Our only reason for asking you to refrain from purchasing them is that we want to see the Dairies who employ our drivers get the business. This will not only help the Dairies of Metropolitan St. Louis who employ our drivers but will also be of assistance to the cause of the American Federation of Labor (AFL) and the Congress of Industrial Organization (CIO).

"Permit us to make it clear that We Are Not Picketing This Store and Have No Dispute With It. Continue to patronize this store as you have in the past. We merely urge you to refrain from purchasing the products of Adams Dairy Company when you do business here.

> "Milk Wagon Drivers, Inside
> Dairy Workers
> Local Union 603
> I.B. of T.C.W. & H. of A."

On the back of each pamphlet was a list of all the dairies in the St. Louis area except plaintiff. These pamphlets were distributed to other unions in the St. Louis area, and Local Union 603 caused its members to distribute the pamphlets at approximately sixty different retail grocery stores in the St. Louis area by handing them to members of the general public as the public was about to enter the stores. Maury Rubin made a statement in the Labor Tribune that over one-half million copies of the pamphlets had been distributed.

Defendant Patrick J. Burke, who was referred to as the "head man" of Local 603 and who is its Secretary-Treasurer and a member of its executive board, admitted that the purpose of distributing the pamph-lets was "to get the public not to buy Adams Dairy products;" "to get the public to buy milk from people under contract with Local 603;" that the pamphlets were aimed to convey the message "do not buy Adams milk;" and were intended to create an agreement among the membership of Local 603 and to urge others not to buy Adams milk. The following answers given by Mr. Burke are typical:

"Q. So the purpose of this circular [pamphlet] was to limit their sales and take that business away from them? A. To take the business over to other companies, yes, who employ and negotiate wages with us. * * *

"Q. Mr. Burke, the last sentence on this pamphlet or circular says, (reading): 'We merely urge you to refrain from purchasing the products of Adams Dairy Company when you do business here.' A. Yes.

"Q. Then you are trying to stop the sales in this store, is that correct? A. No.

"Q. Of Adams milk? A. That's correct."

Defendants pleaded in their return to the order to show cause, and the evidence established, that with the exception of plaintiff's milk wagon drivers, all drivers of all the dairies in the St. Louis area are members of Local 603, and that all of said drivers are governed as to wages and working conditions by an identical industry wide contract. As a justification for the distribution of the pamphlets the defendants contended that the contract between plaintiff and the independent union differs from the contract to which Local 603 is a party; that this difference tends to weaken the bargaining position of Local 603; and that plaintiff had conducted an advertising campaign to induce the public to purchase milk at the store instead of by way of home delivery, and if this campaign were successful Local 603 would "lose much business," large numbers of salesmen-drivers of other

dairies would lose their jobs, Local 603 would lose a substantial portion of its membership and would have its representation and bargaining position seriously reduced. The defendants then alleged that it was considered to be essential that an effort be made to counteract the advertising of plaintiff to have the public buy milk at the store, and that as a means of counteracting said publicity, Local Union 603 prepared the pamphlet for distribution to the general public. However, the evidence discloses that there are two other dairies in the St. Louis area which deliver milk at wholesale solely to retail stores, using members of Local 603 to do so, and no pamphlets were circulated urging the public not to buy the milk of those dairies. In addition several dairies, which used members of Local 603, distribute milk to both, the homes and to retail stores, but no pamphlets were circulated urging the public not to buy in the retail stores the milk of those dairies. The pamphlets made no mention whatever of the interest of Local 603 in having milk delivered directly to the home, because, according to Mr. Burke, "We had other mediums through which we advertised buy your milk at the door," and Mr. Burke testified that the pamphlet was not directed to the point of urging people to buy milk at home or of keeping the jobs of the retail drivers. As to the allegations of the defendants that the differences in the contract impaired Local 603's bargaining position, Mr. Burke testified that he had not seen the contract between plaintiff and the independent union, and the evidence indicates that as compared to milk wagon drivers working under the contract of Local 603, plaintiff's milk wagon drivers receive a higher guaranteed weekly wage and make more money even though the commission rate is less for units in excess of 40,000 delivered in one month. Mr. Burke stated that he did not know of the difference in the commission rate when the campaign to stop the sale of plaintiff's products was started, and he subsequently testified that the purpose of the pamphlets was not to attempt to improve the working conditions of the men.

Mr. Walter Bush, president of Local 603 and a member of its executive board, stated that the pamphlets were distributed to "protect our membership, their livelihood and the income of the organization," and he also stated that the objective was to curtail plaintiff's business and sales. Reed J. White, a business representative of Local 603 and a member and the secretary of the executive board, stated that the purpose of the pamphlets was to inform the public that plaintiff's drivers were not members of Local 603, but he "couldn't say" that plaintiff could ever affect the loss of retail drivers.

Maury Rubin is the sole owner and publisher of the St. Louis Labor-Tribune which has a circulation of about 78,000. Burke is a member of the "Board of Advisors," of the Labor-Tribune, but for the past several years he had not been solicited by Rubin for advice. Shortly after the distribution of the pamphlets was started by Local 603, Burke gave Rubin a copy of the pamphlet and explained the position of Local 603 concerning Adams Dairy Company, but Burke and Rubin stated that Burke did not request Rubin to do anything. However, with reference to Local 603's campaign to stop the sales of plaintiff's milk the defendants pleaded that Local 603 "caused to be published in the St. Louis Labor Tribune certain appeals to the public." The general tenor of the articles published were to urge the reading public not to buy Adams milk, and reference was made to "100% Union dairies" as contrasted to Adams Dairy. This was an incorrect and misleading statement in view of the certification of the independent union by the N.L.R.B. Rubin testified that the statement was an oversight, and that he meant that Adams Dairy was not a 100% A.F. of L. union dairy. Reference was also made in some of the articles to one of the large retail chain grocery stores as a "violator" because it continued to handle plaintiff's milk. In general, the articles also tended to give the impression that the independent union was not a bona fide union, although

the N.L.R.B. had held it was, that a labor dispute existed between Local 603 and plaintiff, and that plaintiff was not fair to organized labor. Rubin also published an article in which he appealed to all union members not to purchase plaintiff's products "as long as they refuse to hire A F L deliverymen." Starting with the issue of December 30, 1954 and in the next following four issues, Rubin printed in the Labor Tribune a coupon which he urged the readers to send to the grocery stores which they patronized. The wording of the coupon asked the store manager to carry exclusively the dairy products which were delivered by members of Local 603, and it was specifically mentioned that the products of Adams Dairy were the only dairy products not so delivered. This coupon contained an implied threat in that by sending the coupon as urged by Rubin, the sender advised the grocery store manager that if he discontinued handling Adams Dairy products he would "spare" the sender the embarrassment as well as the necessity of going elsewhere to buy milk and other dairy products.

There also was evidence that during the time the pamphlets were being distributed and the articles run in the Labor-Tribune, some damage was done in some of the retail stores to products of plaintiff, but there was no evidence as to who did the damage other than the circumstances that at these stores drivers of Local 603 also delivered milk of other dairies and had access to plaintiff's milk in the store.

Burke stated that he was a member of the "Teamsters' Council" composed of representatives of 21 unions in the St. Louis area, and that he informed the other members that Local 603 was "carrying out a campaign for the public not to buy Adams Dairy products" but he stated that he did not urge the members to carry out the campaign in their respective unions. Bush, president of Local 603, visited numerous other unions and advised them that all dairies in the St. Louis area had contracts with Local 603 for the milk wagon drivers except Adams Dairy. At one time Burke accompanied Nick Blassie, representative of the Meat Cutters Union, when Blassie requested the owner of several super markets to discontinue patronizing plaintiff and to patronize other dairies who employed members of Local 603.

The facts of this case distinguish it from the usual "labor injunction" case. Here there is no labor dispute whatever between an employer and its employees or between an employer and a union. There are no organizational efforts by a union. In fact Local 603 denies most emphatically that it claims the right to represent plaintiff's milk truck drivers or that it even desires to represent them. Neither is Local 603 attempting to improve working conditions nor is it attempting to compel compliance by plaintiff with any contract covering conditions of employment, and it is not attempting to have a nonunion employer maintain union working standards. Local 603 also takes the position that it does not have the objective of accomplishing anything that would result in a violation of the federal Act, such as coercing plaintiff's employees to abandon the independent union, coercing plaintiff to interfere with the free choice of its employees as to which union should represent them, or by instituting that form of a secondary boycott made an unfair labor practice by Section 8(b)(4).

The defendants frankly admit that by use of the pamphlets they entered into a campaign to obtain an agreement by the members of Local 603 not to purchase plaintiff's products, and to stop the purchase of plaintiff's products by the public. This concerted action constitutes a boycott of plaintiff's products, and the manner in which it has been carried out results in what has sometimes been termed a "consumption boycott" as distinguished from a "production boycott." C.C.H. Labor Law Reporter, par. 237 et seq. While there are many definitions of a boycott, in general, it may be said to include any activity on the

part of a labor organization, or for that matter any other group of persons, whereby it is sought through concerted action, other than by reason of lawful competition, to obtain withdrawal of public patronage from one in business. See the annotations on the use of a boycott as a weapon in industrial disputes in 6 A.L.R. 909 and 116 A.L.R. 484. It is important to note that in discussing or defining a "labor boycott" reference is invariably made to the refusal to purchase, use or produce the products of an employer in connection with a labor dispute. In this case there is no bona fide labor dispute between Local 603 and plaintiff, or between Local 603 and the independent union. Adams Dairy Co. v. Dairy Employees Union, Local 207, of International Brotherhood of Teamsters, etc., A. F. of L., 363 Mo. 182, 250 S.W.2d 481 [3]; Purcell v. Journeymen Barbers & Beauticians International Union of America, Local 192–A, 234 Mo.App. 843, 133 S.W.2d 662 [10].

A union may use various forms of concerted action, such as strike, picketing, or boycott, to enforce or obtain a lawful objective that is reasonably related to any legitimate interest of organized labor. Fred Wolferman, Inc., v. Root, 356 Mo. 976, 204 S.W.2d 733 [2], 174 A.L.R. 585, certiorari denied 333 U.S. 837, 68 S.Ct. 608, 92 L.Ed. 1122; Hobbs v. Poteet, 357 Mo. 152, 207 S.W.2d 501 [2]; Caldwell v. Anderson, 357 Mo. 1199, 212 S.W.2d 784 [3]; Annotations: 6 A.L.R. 909 and 116 A.L.R. 484; 31 Am.Jur., Labor, § 38. However, it is universally held that the objective of concerted labor activity must be a lawful one. Fred Wolferman, Inc., v. Root, supra [2]; State ex rel. Allai v. Thatch, 361 Mo. 190, 234 S.W.2d 1 [9]; Kincaid-Webber Motor Co. v. Quinn, 362 Mo. 375, 241 S.W. 2d 886 [3]; Purcell v. Journeymen Barbers, etc., supra [13]; George F. Stuhmer & Co. v. Korman, 241 App.Div. 702, 269 N.Y.S. 788 [1], affirmed 265 N.Y. 481, 193 N.E. 281; Moreland Theatres Corporation v. Portland Moving Picture Machine Operators' Protective Union, Local No. 159, 140 Or. 35, 12 P.2d 333 [11]; Sansom House Enterprises, Inc., v. Waiters and Waitresses Union, Local 301, AFL, 382 Pa. 476, 115 A.2d 746 [1]; Dallas General Drivers, Warehousemen and Helpers v. Jax Beer Co. of Waco, Texas, Tex.Civ. App., 276 S.W.2d 384 [4]; Treasure, Inc., v. Hotel and Restaurant Employees and Bartenders' Union, Local No. 133 (A. F. of L.), Fla., 72 So.2d 670 [1]; Dalzell Towing Co., Inc., v. United Marine Division, I.L. A., Local 333, Sup., 124 N.Y.S.2d 70 [2], affirmed 281 App.Div. 968, 120 N.Y.S.2d 927; Woodard v. Collier, 210 Ga. 239, 78 S.E.2d 526 [2]; Wood v. O'Grady, 283 App.Div. 83, 126 N.Y.S.2d 408; Annotations: 6 A.L.R. 909 and 116 A.L.R. 484. In addition to the requirement that the objective be lawful, the objective must be sought by lawful means. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Missouri Cafeteria, Inc., v. McVey, 362 Mo. 583, 242 S.W.2d 549 [2]; State ex rel. Allai v. Thatch, supra [9]; Annotations: 6 A.L.R. 909 and 116 A.L.R. 484. Otherwise the persons injured by such activity may obtain damages, injunctive relief or both. Fred Wolferman, Inc., v. Root, supra [2]; Missouri Cafeteria, Inc., v. McVey, supra [8]; Park & Tilford Import Corporation v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 848, A. F. of L., 27 Cal.2d 599, 165 P.2d 891[1], 162 A.L. R. 1426; James v. Marinship Corporation, 25 Cal.2d 721, 155 P.2d 329 [2], 160 A.L.R. 900; Annotations: 6 A.L.R. 909 and 116 A.L.R. 484.

Defendants contend that the purpose of the concerted activity was to encourage home delivery of milk and thereby protect the jobs of the retail drivers. However, not only is this contention not supported by the evidence, it is contrary thereto. The publications issued by the defendants do not mention this matter, and Mr. Burke unequivocally testified that the pamphlets were not directed to this objective. In addition, it is inconsistent with

such objective to direct the pamphlets and coupons solely against plaintiff when two other dairies in the St. Louis area also deliver milk at wholesale only to retail stores, and other dairies deliver milk to the retail stores at wholesale and also make retail deliveries to the homes. The pamphlets, in effect, urge the public to buy milk at the stores, but not plaintiff's milk. If the objective were as contended by the defendants, it would be necessary to urge that the milk and milk products of the other dairies delivered to the retail stores not be purchased, which was not done. See George F. Stuhmer & Co. v. Korman, supra, wherein it was held that where a union permitted the sale of nonunion made bread other than plaintiffs, this circumstance justified the inference that the purpose of picketing was to destroy plaintiff's business and not to better labor conditions. In addition, we may and do consider the circumstance that the defendants apparently never considered it to be in the interest of the retail drivers to stop or curtail the sales of plaintiff's products until plaintiff's milk drivers withdrew from Local 603. The retail drivers could be hurt no more, if at all, by plaintiff's operations after plaintiff's drivers left Local 603 than before.

It is also clear that the differences in the terms of the contracts could not have motivated the concerted activity because Mr. Burke had never seen the contract between plaintiff and the independent union, and it was not until after the distribution of the pamphlets was started that he learned of the difference in the commission rate.

The determination of the objectives of the defendants is a question of fact, Fred Wolferman, Inc. v. Root, supra [3], and from a careful consideration of the evidence and the circumstances, we are compelled to conclude that the objective of the concerted action was not any of the above contended purposes. Therefore, we need not consider whether the defendants would be justified in entering into a combination to stop the sale of plaintiff's products for these contended reasons.

The defendants next contend that the objective of their concerted action was to cause the public to buy milk delivered exclusively by members of Local 603. Although the pamphlets and the coupons were cleverly written to impart to the casual reader that a labor dispute existed between plaintiff and Local 603, which it did not, and that plaintiff did not employ 100% union labor, which it did, they did advance the appeal to the public not to buy the dairy products of plaintiff because they were not delivered by members of Local 603. This is somewhat kindred to the appeals made by unions to the public in connection with a labor dispute that it should buy or use only the products of an employer who hires union labor. However, plaintiff did hire 100% union labor, and regardless of the boundaries of justifiable conduct in an organizational campaign by a union, the circumstances here make the rules in such cases inapplicable. In this case plaintiff hired and used 100% union labor and it was required by federal law to recognize the independent union as the exclusive representative of all of its milk wagon drivers. It is forbidden by the same law from negotiating with Local 603 to have its milk delivered by members of that union. The admitted purpose of the concerted action was to take plaintiff's business away from it and to give the business to plaintiff's competitors. It is inconceivable that the public policy of this state should be to label as a legitimate labor objective the willful and intentional damaging or destruction of an employer's business because the employer is doing that which the federal law requires him to do and forbids him to change if he is to remain in business.

Concerted union activity has uniformly been held to be unlawful when the purpose is not primarily intended to benefit the union in carrying out a lawful objective or to improve working conditions, but has as its primary purpose injury to the business of the person against whom the action is directed. George F. Stuhmer & Co. v. Korman, supra [1, 2]; Moreland Theatres

Corp. v. Portland Moving Picture Machine Operators' Protective Union, supra [7]; Overseas Storage Co. v. Chlopsek, 209 App. Div. 834, 204 N.Y.S. 845; Annotations at 27 A.L.R. 651, 32 A.L.R. 779 and 116 A.L.R. 484; 15 C.J.S., Conspiracy, § 10; 36 Am.Jur. Monopolies, Combinations and Restraints of Trade § 27. In Aeolian Co. v. Fischer, D.C., 27 F.2d 560, 564, injunctive relief against a boycott involving the refusal to work with non-union men was denied under the facts of that case, but in the opinion the court said: "How far the members of a craft may go in their organized capacity * * * depends upon the extent to which those who co-operate have in point of fact a common interest, and are justified in what they do by honest motives to advance self-interest, as opposed to malicious intent to injure the business or good will of another."

We conclude from all the evidence and circumstances, and particularly from the admissions of the defendants, that the purpose of the concerted activity against plaintiff was not reasonably related to and not in the furtherance of any *legitimate* objective of Local 603, but was imposed and carried out by the defendants as a means of inflicting, as its primary objective, damage to plaintiff's business because the plaintiff, by requirement of law, was conducting its business contrary to the wishes of the defendants. This constituted a malicious interference with the business of another. 36 Am.Jur. Monopolies, Combinations, and Restraints of Trade § 26.

Section 416.010 RSMo 1949, V.A.M.S., entitled "Combination in restraint of trade declared a conspiracy" provides as follows: "Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this state, or any article or thing bought or sold whatsoever,

shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punished as provided in sections 416.010 to 416.100, 416.240, 416.260 to 416.290 and 416.400." This statute has been held to be inapplicable to concerted activities of members of labor organizations carried on for lawful objectives. Caldwell v. Anderson, 357 Mo. 1199, 212 S.W.2d 784; Gruet Motor Car Co. v. Briner, Mo.App., 229 S.W.2d 259. But it is applicable to concerted activities for an unlawful objective which result in a restraint of trade. Rogers v. Poteet, 355 Mo. 986, 199 S.W.2d 378; Hobbs v. Poteet, supra; Empire Storage & Ice Co. v. Giboney, 357 Mo. 671, 210 S.W.2d 55; and Giboney v. Empire Storage & Ice Co., supra; Anheuser-Busch, Inc., v. Weber, 364 Mo. 573, 265 S.W.2d 325, reversed on jurisdictional grounds 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546. The unlawfulness of a conspiracy may be found either in the end sought or the means used. Frank Schmidt Planing Mill Co. v. Mueller, Mo.App., 154 S.W.2d 610 [2]; A. T. Stearns Lumber Co. v. Howlett, 260 Mass. 45, 157 N.E. 82 [1], 52 A.L.R. 1125; 15 C.J.S., Conspiracy, §§ 3 and 4. Here the combination of the defendants to stop the sale of plaintiff's products had no lawful objective, it resulted in the restraint of the purchase and sale of plaintiff's products, and was therefore a conspiracy in violation of Section 416.010.

Although Maury Rubin is not an officer or member of Local 603, he voluntarily joined into the conspiracy with full knowledge of the objectives of the other defendants, and in aid thereof published misleading articles and published the coupons, containing the implied threat, appealing to his readers and to the public in general to stop the purchase and sale of plaintiff's products, and when the purpose of a combination is illegal, every act in furtherance thereof is illegal. Moreland Theatres Corporation v. Portland Moving Picture Machine Operators' Protective Union, supra.

Defendants contend that they were engaging only in activities which are guaranteed against restraint by the First and Fourteenth Amendments of the United States Constitution, and Missouri Constitution of 1945, Article I, section 8. They cite in support of this position Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; United States v. Hutcheson, 312 U.S. 219, 243, 61 S.Ct. 463, 85 L.Ed. 788; Milk Wagon Drivers' Union, Local No. 753, etc., v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855, and other cases. We have read and studied all the cases cited and are of the opinion that none extends the constitutional guaranty of free speech to the situation here. In the interest of brevity we shall comment only on those cases above mentioned.

In Thornhill v. Alabama it was held that the dissemination of information concerning the facts of a labor dispute must be regarded as within the area of free discussion that is guaranteed by the United States Constitution, a general principle with which there is no dispute. But in Giboney v. Empire Storage & Ice Co., supra, the United States Supreme Court affirmed the validity of Section 416.010 RSMo 1949, V.A.M.S., as applying to concerted activity of members of a labor organization, and in commenting upon Thornhill v. Alabama stated that the union's conduct in that case "constituted a single and integrated course of conduct, which was in violation of Missouri's valid law", Section 416.010, and that the constitutional right to freedom of the press and speech does not extend "its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." [336 U.S. 490, 69 S.Ct. 688.]

Schneider v. State pertained to the validity of an ordinance which prohibited the distribution of handbills and circulars on the public street. That case did not involve any question pertaining to the right to pass out handbills or circulars in furtherance of an illegal conspiracy in violation of a valid state law.

United States v. Hutcheson was a criminal case in which the defendant was charged with the violation of the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15 note. The conduct of the defendant had some similarity to the conduct here, except that a strike was involved and the whole dispute arose out of a jurisdictional dispute between two craft unions, while here we have no labor dispute, as far as the law of this state is concerned, between an employer and a union or between unions. The majority opinion apparently proceeded on the theory that the conduct probably constituted a violation of the Sherman Anti-Trust Act standing alone, but by passage of the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq., Congress had established the " 'public policy of the United States' ", and it was held that the Sherman Act, the Clayton Act, 15 U.S.C.A. § 12 et seq., and the Norris-La Guardia Act must all be read together as a "harmonizing text of outlawry of labor conduct." [312 U.S. 219, 61 S.Ct. 466.] We have no statute in Missouri similar to the Norris-La Guardia Act purporting to limit the jurisdiction of the state courts over the conduct of the defendants in this case, and Missouri, rightfully or wrongfully, has not seen fit to exempt activities of labor unions and their members from its statute making illegal certain conspiracies in restraint of trade. Giboney v. Empire Storage & Ice Co., supra. As stated in the Giboney case, the constitutional guaranties do not "afford labor union members a peculiar immunity from [state] laws against trade restraint combinations". [336 U.S. at page 495, 69 S.Ct. at page 687, 93 L.Ed. at page 840].

Milk Wagon Drivers Union, etc., v. Lake Valley Farm Products pertained only to whether certain conduct was in furtherance of a "labor dispute" within the broad defini-

tion of that term as contained in the Norris-La Guardia Act which limited the jurisdiction of federal courts, and American Federation of Labor v. Swing held no more than that the constitutional guaranty of freedom of discussion is infringed by the common law policy of a state limiting peaceful picketing by labor unions to situations in which the controversy is between the employer and his own employees.

This court recently held that concerted union activity in the form of "Picketing, even though properly conducted in all respects, may be enjoined if its objective is unlawful as violative of the public policy of a state, either legislatively or judicially declared. And the enjoining of unlawful-objective picketing does not constitute a denial of the constitutional guaranty of free speech." See Heath v. Motion Picture Machine Operators Union No. 170, Mo.Sup., 290 S.W.2d 152, 157, and the cases there cited. Picketing is but a form of communication as is the distribution of the pamphlets and coupons in this case, and we see no material distinction between unlawful-objective picketing and the unlawful-objective distribution of pamphlets and coupons in furtherance of an illegal conspiracy in restraint of trade.

Although defendants deny any violation of the federal Act, they urge that if the facts are as contended by plaintiff, neither the trial court nor this court has any jurisdiction over the subject matter of this action because the processes provided for in the federal Act are exclusive. This "delicate problem," Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546, of jurisdiction is by no means settled, but in Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A.F.L.), 346 U.S. 485, 74 S.Ct. 161, 164, 98 L.Ed. 228, it was said that the federal Act "leaves much to the states," and by distinguishing the facts in that case from situations in which there is injurious conduct which the National Labor Relations Board is without express power to prevent, it was made clear

that in many situations the states retain jurisdiction over concerted activity by labor unions. Express approval was given to the previous cases which held, in effect, that a state may exercise " ' "its historic powers over such traditionally local matters as public safety and order and the use of streets and highways" ' ", and as it has subsequently been said, "the contention that Congress intended to legislate for the entire field of labor controversy and excluded all State jurisdiction is untenable." Irving Subway Grating Co., Inc., v. Silverman, D.C., 117 F.Supp. 671, 680. See also United Automobile, Aircraft and Agricultural Implement Workers of America, etc. v. Wisconsin Employment Relations Board, U.S., 76 S.Ct. 794.

In Weber v. Anheuser-Busch, Inc., supra [348 U.S. 468, 75 S.Ct. 488], it was held that where the "moving party itself alleges unfair labor practices [under the federal law], where the facts reasonably bring the controversy within the sections prohibiting these practices, and where the conduct, if not prohibited by the federal Act, may be reasonably deemed to come within the protection afforded by that Act, the state court must decline jurisdiction in deference to the tribunal which Congress has selected for determining such issues in the first instance." It is clear from this statement that if these enumerated conditions are not present, state courts are not prohibited by reason of the federal Act from exercising jurisdiction. In this case plaintiff did not allege "unfair labor practices" under the federal Act, and we are of the opinion that the facts do not reasonably bring the controversy within the sections of the federal Act prohibiting "unfair labor practices" or within that conduct for which protection is afforded by that Act.

The defendants were not attempting to exercise any right guaranteed to labor organizations under Section 7 of the federal Act. The Supreme Court of the United States has held that Section 7 does not grant to employees or labor unions the

right to engage in any and all concerted activity. The Act "does not excuse 'concerted activities,' themselves independently unlawful." N. L. R. B. v. Peter Cailler Kohler Swiss Chocolates Co., Inc., 2 Cir., 130 F.2d 503, 506. See also National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, where the right to engage in concerted activities did not make legal a sit-down strike which state law made illegal. See also International Union, U.A.W., A.F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651, where it was pointed out that if the courts had not held that Section 7 did not include the right to violate the law, Congress would have done so, and that such provision was not specifically included in the present language of Section 7 because, as stated in H. R.Rep. No. 510, 80th Cong., 1st Sess. p. 38, "the courts have firmly established the rule that under the existing provisions of Section 7 of the National Labor Relations Act, employees are not given any right to engage in unlawful or other improper conduct." Also see Local Union No. 1229, International Brotherhood of Electrical Workers v. N. L. R. B., 91 U.S.App.D.C. 333, 202 F.2d 186, 189, and the comment in footnote 17 that "concerted activity violating valid state law will not be protected by § 7 of the Act."

■ Defendants also contend that the state courts do not have jurisdiction because if the facts are as we have found them their conduct is of the nature and type made to constitute an unfair labor practice under Section 8(b) (4). We do not agree. The evidence in this case clearly establishes that the pamphlets were distributed at the customer entrances of the retail stores, and that no attempt to stop deliveries was made and no deliveries were stopped. There is no evidence that any employee of the retail stores or the employees of any other employer was induced or coerced to go on strike or to refuse, in the course of their employment, to use, process or otherwise handle plaintiff's products. Neither is there substantial evidence that the defendants forced or attempted to force a secondary employer subject to the federal Act to cease doing business with plaintiff. In Crowley's Milk Company, Inc. and Milk Drivers and Dairy Employees Local Union No. 680, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, A. F. of L. and United Dairy Workers Association, 102 N.L.R.B. 996, one Smith was ordered by the N.L.R.B. to be reinstated. The employer contended that Smith was not entitled to reinstatement because he had engaged in an unlawful boycott under Section 8(b) (4). Note what was said by the N.L.R.B. at pages 997 and 998: "With respect to the alleged secondary boycott, Smith admitted at the second hearing that he had picketed two of the Respondent's *customers*. The only establishment identified was the Guernsey Crest Ice Cream Company of Paterson, where it appears that a picket sign was carried in front of the customers' entrance. The sign read in effect 'This establishment sells products of Crowley's Milk Company, which Company is on strike. Please do not buy Crowley's products. Teamsters Local 680, A.F.L.' When asked by Respondent's counsel at the second hearing if he did not picket Crowley's customers to influence the customers' employees to cease handling Crowley's products, Smith answered 'we picketed the stores so that the customers would not buy Crowley's products.' The foregoing is the only persuasive evidence adduced at either hearing concerning the alleged secondary boycott. Section 8(b) (4) (A) of the Act provides that it shall be an unfair labor practice for a labor organization or its agents—' * * * to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods * * * where an object thereof is * * * forcing or re-

294

quiring * * * any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *.' It is clear from the record that in picketing the premises of the Respondent's customers the Union intended to institute a *consumer* boycott only. There is no evidence, either direct or circumstantial, that the Union made any appeal to employees of the Respondent's customers, or ever picketed the employee or delivery entrances of any of the customers. In the circumstances the Union's secondary picketing, whether it be viewed as a direct appeal to the Respondent's customers or as an appeal to those doing business with the Respondent's customers, was not violative of Section 8(b) (4) (A) of the Act." This order of the N.L.R.B. was subsequently enforced by the United States Circuit Court of Appeals. N. L. R. B. v. Crowley's Milk Co., Inc., 3 Cir., 208 F.2d 444.

In N. L. R. B. v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, International Union of Electrical, Radio & Machine Workers, CIO, 2 Cir., 228 F.2d 553, 559, the court, in commenting on the scope of Section 8(b) (4) said: "But the Taft-Hartley Act does not proscribe all secondary activity. We have held that requests and threats addressed directly to secondary employers are not illegal, Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906, 911, 912; see N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 226 F.2d 900; and we have indicated that solicitation of customers of secondary employers is also lawful. See N. L. R. B. v. Service Trade Chauffeurs, Salesmen, and Helpers, Local 145, supra, at 2 Cir., 191 F.2d [65] at page 68. The only thing proscribed by § 8(b) (4) is inducement or encouragement of the employees of customers." See also Administrative Decision of the General Counsel [of N.L.R.B.], Case No. K–147, Jan. 12, 1956, C.C.H.Labor Law Reporter, par. 53,-

495, which pertained to a situation involving activity similar to that in this case, and Milwaukee Boston Store Co. v. American Federation of Hosiery Workers, Branch 16, A.F. of L., 269 Wis. 338, 69 N.W.2d 762 [7].

We have concluded in this case that the acts of the defendants constituted an illegal conspiracy in violation of the laws of this state, and that the boycott pursuant to that conspiracy was not imposed or carried out for any lawful labor objective. This case falls exactly within the ruling in G., H. & E. Freydberg, Inc., v. International Ladies' Garment Workers' Union, Sup., 128 N.Y.S. 2d 470, 472. There the union picketed an employer for the purpose of compelling it to maintain a factory in New York. The court said: "I think * * * that is not a lawful labor objective, that there consequently is no labor dispute or any controversy involving labor relations, and that the picketing, even if peaceful, is unlawful because it is an attempt to injure plaintiff by subjecting it to economic pressure without justification in law. * * * As to the question of jurisdiction, I assume in defendants' favor that plaintiff is engaged in interstate commerce. From that it follows that existing Federal statutes so completely cover the subject of labor relations in interstate commerce that neither State statutes nor State courts can add to or subtract from the rights and immunities of employers or employees as specified in those Federal statutes [Cases cited including Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A.F.L.)]. But my holding that this picketing is not for a lawful labor objective takes this case out of the field of labor relations and out of the doctrine of those cases. This picketing is not an exercise of any right conferred, recognized, or regulated by any Federal statute, and is not designed to enforce or secure recognition of any such right, or to prevent conduct by plaintiff which any Federal statute denounces as 'an unfair labor practice'; and the injunction is not sought in order to prevent conduct by defendants which any Fed-

eral statute denounces as an unfair labor practice. The picketing is a tortious act under the law of New York entirely apart from any labor relation; and as I see it this case hence is precisely what the Supreme Court said the Garner case was not, namely, 'an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is "governable by the state or is entirely ungoverned." ' See 346 U.S. [485] at page 488, 74 S.Ct. [161] at page 164 [, 98 L.Ed. 228]."

This case is distinguishable from Graybar Electric Company, Inc. v. Automotive, Petroleum & Allied Industries Employees Union, Local 618, Mo.Sup., 287 S.W.2d 794; and Jack Cooper Transport Company v. Stufflebeam, Mo.Sup., 280 S.W.2d 832, in that the concerted activity of the defendants in this case was not done in furtherance of any legitimate objective of a labor union, and the facts do not "reasonably bring the controversy within the sections [of the federal Act] prohibiting these practices, and * * * the conduct, if not prohibited by the federal Act, may [not] be reasonably deemed to come within the protection afforded by that Act". See Weber v. Anheuser-Busch, Inc., supra [348 U.S. 468, 75 S.Ct. 488].

For the reasons above set forth the trial court erred in denying the plaintiff injunctive relief from the conduct of the defendants, and therefore the judgment is reversed and the cause remanded for further proceedings in accordance with the views here expressed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.