THE COOPERATIVE REFINERY ASSOCIATION, *Appellant*, v. ROY L. WILLIAMS et al., *Appellees.*

No. 41,422

THE COOPERATIVE FARM CHEMICALS ASSOCIATION, *Appellant*, v. ROY L. WILLIAMS et al., *Appellees.*

(345 P. 2d 709)

Opinion filed November 7, 1959.

*John J. Hasburgh, Jr.,* and *Melvin J. Spencer,* of Kansas City, Missouri, *Richard B. Stevens,* of Lawrence, and *Clement H. Hall,* of Coffeyville, were on the briefs for the appellants.

*Robert L. Kimbrough, George E. McCullough, W. L. Parker, Jr., Walter N. Scott* and *Floyd E. Gehrt,* all of Topeka, were on the briefs for the appellees.

The opinion of the court was delivered by

WERTZ, J.: These actions to enjoin the defendants from maintaining picket lines in the vicinity of plaintiffs' Coffeyville and Lawrence, Kansas, plants and premises were commenced separately —case No. 41,421 in the district court of Montgomery county and case No. 41,422 in the district court of Douglas county. In each case an appeal was taken from the order of the trial court sustaining defendants' demurrer to the plaintiff's evidence. These appeals have been consolidated in this court upon the stipulation by all parties that the decision in case No. 41,422 will govern and constitute the decision in case No. 41,421, and they will be so considered.

Case No. 41,422 was tried upon (1) a stipulation by the parties

that all allegations or statements of fact set forth in the petition were true and (2) additional stipulated facts. The allegations of the petition may be summarized as follows: The named defendants (appellees) are officers, business representatives, stewards or other officials or agents of Local Union No. 41 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, which will be hereinafter referred to as the Teamsters Union. The Teamsters Union maintains an office at 116 West Linwood Boulevard, Kansas City, Missouri, and is the representative or collective bargaining agent of certain employees of The Consumers Cooperative Association, hereinafter referred to as CCA.

CCA is a Kansas corporation licensed to do business in the state of Missouri and has its principal office and place of business at 3315 North Oak Trafficway, North Kansas City, Missouri. CCA also has a warehouse at 1500 Iron Street, North Kansas City, Missouri, and is engaged in the business of purchasing, selling and distributing farm and home supplies to retail farmers' cooperative associations in the middle west.

The collective bargaining contract between CCA and the Teamsters Union expired on or about March 31, 1958. No agreement was reached during the collective bargaining negotiations carried on prior to and subsequent to the expiration of the contract. As a result, on April 18, 1958, the Teamsters Union notified CCA that it was on strike and had instructed certain of its members to picket CCA's warehouse and terminal at 1500 Iron Street. Shortly thereafter, certain of its members stationed themselves in and about the entrances to the premises carrying placards stating, "Truck Drivers and Warehousemen on Strike Against C. C. A., Kansas City, Missouri." On April 22, 1958, other of its members set up picket lines in and about the entrances to CCA's general office building at 3315 North Oak Trafficway. They carried similar placards.

About two and one-half weeks after the strike commenced in Missouri, the Teamsters Union sent the named defendants and other of its personnel from Kansas City, Missouri, to Lawrence, Kansas, where they set up picket lines in and around the entrances to the premises of The Cooperative Farm Chemicals Association (plaintiff-appellant), which is a separate Kansas corporation engaged in the business of manufacturing, processing, storing and distributing agricultural chemicals and fertilizers. This corporation will

hereinafter be referred to as the Association. The defendants carried placards containing language identical to that on the placards being carried by the strikers in Kansas City, Missouri.

At the time the picket lines were set up around the Association's premises, all of the defendants knew that no dispute existed between the Association and any of its employees, that the employees of the Association were validly represented by another union (Local Union No. 5-613 of the Oil, Chemical and Atomic Workers International Union, AFL-CIO), which was the exclusive collective bargaining agent certified by the National Labor Relations Board, and that a valid collective bargaining contract was then in effect covering all of the Association's employees.

Neither the defendants nor the Teamsters Union sought to represent any of the Association's employees or to otherwise bargain or present any demands with respect to the wages, hours or working conditions of such employees. The picket lines were not set up for any of these purposes, but, rather, all of the defendants knew that the public, including the Association's customers, and the drivers of both intrastate and interstate truck lines which normally picked up and delivered the Association's merchandise would be misled and caused to believe that a dispute existed between the Association and its employees. Further, they knew and intended that the drivers of such truck lines would refuse to cross the picket lines. They also knew that the demands for the Association's products were greatest at this particular time. The picketing had its intended effect, in that the drivers of intrastate and interstate truck lines refused to pick up or deliver shipments from the Association's plant, thus seriously disrupting the distribution of such products. The Association could make no concession or other agreement which would in any manner solve or affect the picketing being carried on by the defendants at its Lawrence plant; moreover, it could do nothing which would tend to settle the strike in Missouri.

The Association alleged that it did not have an adequate remedy at law and that the unlawful acts of the defendants would be continued indefinitely, resulting in irreparable injury and damage to it. It asked that the defendants be temporarily and permanently restrained and enjoined from maintaining the picket lines.

A temporary restraining order was issued ordering defendants to desist from picketing the Association's premises. The Associa-

tion executed and filed its temporary restraining order bond to pay the defendants for such damage as they might incur by reason of any wrongful issuance of such order. An agreed statement of facts was filed wherein the parties stipulated as follows: CCA is the owner of seventy-five per cent of the common stock of the Association and Mr. Howard A. Cowden is president and general manager of CCA, as well as president of the Association. The collective bargaining contract signed by the Association with its employees contained the signature of Fred F. Claxton, who was the personnel director of CCA. The collective bargaining contract between CCA and the Teamsters Union included the signature of C. K. Ward, the predecessor of Fred F. Claxton.

The volume of interstate business engaged in by the Association exceeds the minimum jurisdictional limitations required by the National Labor Relations Board in order for the Board to assert jurisdiction.

Subsequent to the strike and picketing against CCA by the Teamsters Union, CCA transferred various units of its trucking equipment from Missouri to other locations within the state of Kansas, but no such units were transferred to the Association's plant in Lawrence. However, during normal operations prior to the strike, a number of CCA trucking units picked up merchandise at the Association's plant and some of these units continued to make such pickups during the time the picket lines were maintained.

The defendants demurred to the evidence on the ground that jurisdiction of the subject matter was pre-empted by the Labor Management Relations Act of 1947 and, therefore, the district court was without jurisdiction to issue either the temporary restraining order or an injunction. The demurrer was sustained on this ground and the temporary restraining order was dissolved. Judgment was entered dismissing the action. At that time the defendants orally moved the court to assess damages under the restraining order bond, claiming as the sole item of damage the sum of $500 for attorney fees. It was agreed that if the defendants were entitled to damages and such damages included attorney fees the amount was reasonable. The court ruled that defendants had been damaged in the amount of the attorney fees and sustained the motion. Following the overruling of its motion for a new trial, the Association perfected this appeal.

At the outset, it may be said that the defendants' activity in going from Missouri, the situs of the strike, to Lawrence, where they set up picket lines in and around the entrances to the Association's premises, was unlawful as being in violation of G. S. 1957 Supp., 44-809 (13), which provides: "It shall be unlawful for any person . . . . (13) To picket beyond the area of the industry within which a labor dispute arises."

Defendants do not contend otherwise. In fact, they admit the picketing was unlawful and take the position that the trial court was without jurisdiction of the subject matter of the action by reason of the so-called federal pre-emption doctrine and, therefore, no state court could grant an injunction regardless of whether the picketing was lawful or unlawful under the provisions of either the state or the federal law. They argue that whether an activity is protected or prohibited by the Labor Management Relations Act of 1947 (hereinafter referred to as the Act) or whether such activity is neither protected nor prohibited by it must, in the first instance, be determined by the National Labor Relations Board (hereinafter referred to as NLRB), and that such a determination cannot therefore be made by a state court. They further contend that it makes no difference whether such activity is protected or prohibited by the Act or is neither protected nor prohibited because state courts have jurisdiction over only one area in labor relations matters affecting interstate commerce, such area being violence in the labor dispute. In support of this argument defendants cite *Plumbers, Etc., Local 298, A. F. of L. v. County of Door*, 359 U. S. 354, 79 S. Ct. 844, 3 L. Ed. 2d 872, and *San Diego Building Trades Council, Etc. v. Garmon*, 359 U. S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775, commonly referred to as the second Garmon case.

The Association, on the other hand, contends that the defendants' activity was neither protected nor prohibited by the Act and that under such circumstances state courts have repeatedly exercised their jurisdiction to enjoin even peaceful picketing such as is involved in the instant case.

It is now well settled that where labor practices are either protected or prohibited by the Act Congress has pre-empted the field in labor relations matters affecting interstate commerce and has vested exclusive jurisdiction in the NLRB to determine such labor disputes. (*Local Lodge No. 774 v. Cessna Aircraft Co.*, 185 Kan. 183, 187, 188, 341 P. 2d 989, and cases therein cited.)

It is equally well settled that Congress never intended to withdraw, and has not withdrawn, from the states *all* jurisdiction over labor relations matters affecting interstate commerce. (*Garner v. Teamsters Union*, 346 U. S. 485, 486, 74 S. Ct. 161, 98 L. Ed. 228; *Weber v. Anheuser-Busch, Inc.*, 348 U. S. 468, 480, 75 S. Ct. 480, 99 L. Ed. 546; *Machinists v. Gonzales*, 356 U. S. 617, 619, 78 S. Ct. 923, 2 L. Ed. 2d 1018.)

In the Weber case, *supra*, it was said at pages 480-481:

"By the Taft-Hartley Act, Congress did not exhaust the full sweep of legislative power over industrial relations given by the Commerce Clause. Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in *Garner v. Teamsters Union, supra*. But as the opinion in that case recalled, the Labor Management Relations Act 'leaves much to the states, though Congress has refrained from telling us how much.' 346 U. S., at 488. This penumbral area can be rendered progressively clear only by the course of litigation."

In the Gonzales case, *supra*, at page 619, the Court stated:

"Congress withdrew from the States much that had theretofore rested with them. *But the other half of what was pronounced in Garner—that the Act 'leaves much to the states'—is no less important.* See 346 U. S., at 488. The statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation. See *Weber v. Anheuser-Busch, Inc.*, 348 U. S. 468, 474-477." [Emphasis supplied.]

In one of the most recent cases dealing with this subject, the Supreme Court again recognized that not all jurisdiction has been withdrawn from the states. (*San Diego Building Trades Council, Etc. v. Garmon*, supra.) The Court quoted with approval the language in the Weber case, *supra*, which has been set forth above. Thus, the Supreme Court did not intend to alter or foreclose the rules announced in the Garner, Weber and Gonzales cases, *supra*, and defendants' contention that the Garmon case, *supra*, has limited state jurisdiction to the area of violence in labor relations matters is without merit.

It appears the underlying principle of the pre-emption rule is that there should not be two conflicting remedies brought to bear on the same subject. In other words, if both federal and state remedies are available, the state should decline to exercise its

remedy and thereby avoid frustration of national labor policies. (*Garner v. Teamsters Union,* supra; *Weber v. Anheuser-Busch, Inc.,* supra; *Machinists v. Gonzales,* supra; *San Diego Building Trades Council, Etc. v. Garmon,* supra.)

Where the activity is neither protected nor prohibited by the Act and is not federally regulated, then the NLRB has no power to entertain the action and, therefore, the activity is "governable by the State or it is entirely ungoverned." In such cases the Supreme Court has declined to find an implied exclusion of state power. (*Auto. Workers v. Wis. Board,* 336 U. S. 245, 254, 69 S. Ct. 516, 93 L. Ed. 651.)

Thus, it is clear that if the picketing in the instant case is not protected or prohibited by the Act, then the district court had jurisdiction and the temporary restraining order was rightfully issued.

Although it may well be argued that no "labor dispute" exists under the facts presented in the instant case (*Gomez v. United Office and Professional Workers,* 73 F. Supp. 679), we need not decide the point but shall proceed to determine whether the activity involved herein is either protected or prohibited by the Act. In making such a determination, the purpose and the method of the activity are all important. (*Hyde Park Dairies v. Local Union No. 795,* 182 Kan. 440, 321 P. 2d 564.).

There can be little question as to the purpose of the picketing of the Association's premises. A review of the stipulated facts clearly reveals that there was no dispute between the Association and its employees, that neither the defendants nor the Teamsters Union sought anything from the Association and had no intention of inducing, encouraging or persuading such employees to engage in any concerted or other activity, that there was no attempt on the part of defendants to organize the Association's employees or to represent them for collective bargaining purposes, and that the picketing had not the remotest connection with working conditions or relations between the Association and its employees.

Furthermore, there is nothing in the record to indicate defendants intended that the Association's employees respect the picket line or that any of such employees did so. The Association and its employees were not performing "struck" or "farmed out" work for CCA and were helpless to intervene in the defendants' dispute with CCA in order to stop the picketing. Ap-

parently, defendants had no such intent but, rather, intended to inflict economic harm on the Association by causing drivers of any truck lines serving the Association to refuse to pick up or deliver merchandise and thereby cause CCA to suffer economic loss indirectly through its stock ownership.

It should also be noted there is nothing in the record tending to show that the Association was doing business with CCA; that is, there is no evidence indicating either corporation bought, sold or handled in any way the products handled by the other corporation. Moreover, there is no evidence to the effect that the Association controlled the labor policies of CCA, or vice versa, with the single exception that an official signed collective bargaining contracts on behalf of each corporation.

Under such circumstances, can it be said that the picketing was protected by the Act? We think not. If the picketing in the instant case is to be protected it must be by reason of section 7 of the Act (29 U. S. C. A., § 157). The purpose of this provision was discussed in *Auto. Workers v. Wis. Board,* supra, and it was said at pages 257 and 258:

"In the light of labor movement history, the purpose of the quoted provision of the statute becomes clear. The most effective legal weapon against the struggling labor union was the doctrine that concerted activities were conspiracies, and for that reason illegal. Section 7 of the National Labor Relations Act took this conspiracy weapon away from the employer in employment relations which affect interstate commerce. No longer can any state, as to relations within reach of the Act, treat otherwise lawful activities to aid unionization as an illegal conspiracy merely because they are undertaken by many persons acting in concert. *But because legal conduct may not be made illegal by concert, it does not mean that otherwise. illegal action is made legal by concert.*" [Emphasis supplied.]

Thus, not all concerted activities may be labeled as protected by section 7 but only those activities which are legal or lawful in the first instance. (*N. L. R. B. v. Dallas General Drivers, Etc., Local No. 745,* 264 F. 2d 642, 646; *Auto Workers v. Wis. Board,* supra, p. 257; *Milwaukee Boston Store Co. v. Amer. Fed. of H. W.,* 269 Wis. 338, 69 N. W. 2d 762; *Adams Dairy v. Burke* [Mo.], 293 S. W. 2d 281; certiorari denied, 352 U. S. 969, 77 S. Ct. 360, 1 L. Ed. 2d 323.) In the instant case, it is admitted that the picketing was unlawful and, therefore, it was not protected by the Act unless defendants' contention that the Association was an "ally" of CCA or a "non-neutral" is correct.

The facts upon which defendants rely to sustain this contention are as follows: (1) CCA replaced some of its striking drivers with non-union drivers, some of whom continued to serve the Association; (2) CCA owns seventy-five per cent of the Association's common stock; (3) the president of CCA is also president of the Association; and (4) the Association's collective bargaining agreement with its employees was signed on its behalf by one or two of the same men who signed such an agreement with the Teamsters Union on behalf of CCA.

The trouble here is that mere common ownership and management are not in and of themselves sufficient to change a neutral employer into an "ally" or a "non-neutral employer." (*J. G. Roy & Sons Co. v. National Labor Relations Bd.*, 251 F. 2d 771; *Gomez v. United Office and Professional Workers*, 73 F. Supp. 679; *N. L. R. B. v. Dallas General Drivers, Etc., Local No. 745*, supra, p. 647.) We conclude that the picketing of the neutral employer in the instant case was not protected by the Act. Therefore, if the state court is without jurisdiction, it must be because such picketing is prohibited by the Act.

Section 8 (*b*) (4) of the Act (29 U. S. C. A., § 158 [*b*]) is the only possible provision under which the picketing could be prohibited as an unfair labor practice. It provides in relevant part as follows:

"(*b*) It shall be an unfair labor practice for a labor organization or its agents—

.    .    .    .    .    .    .    ..    .    .    .    .    .

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a *strike or a concerted refusal in the course of their employment* to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring  .  .  .  any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, *or to cease doing business with any other person;*  .  .  ." [Emphasis supplied.]

It has been held that the provisions of the mentioned section "are expressly limited to the inducement or encouragement of *concerted* conduct by the employees of the neutral employer." (*Labor Board v. Rice Milling Co.*, 341 U. S. 665, 670, 671, 71 S. Ct. 961, 95 L. Ed. 1277.) In that case, the Court went on to say at page 671:

"That language contemplates inducement or encouragement to some concert of action greater than is evidenced by the pickets' request to a driver of a single truck to discontinue a pending trip to a picketed mill. There was no attempt by the union to induce any action by the employees of the neutral

customer which would be more widespread than that already described. There were no inducements or encouragements applied elsewhere than on the picket line. . . . The picketing was directed at the Kaplan employees and at their employer in a manner traditional in labor disputes. Clearly, that, in itself, was not proscribed by § 8 (b) (4). Insofar as the union's efforts were directed beyond that and toward the employees of anyone other than Kaplan, there is no suggestion that the union sought *concerted* conduct by such other employees. . Such efforts also fall short of the proscriptions in § 8 (b) (4). In this case, therefore, we need not determine the specific objects toward which a union's encouragement of concerted conduct must be directed in order to amount to an unfair labor practice under subsection (A) or (B) of § 8 (b) (4). A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees. Generally, therefore, such actions do not come within the proscription of § 8 (b) (4), and they do not here."

In *Joliet Contractors Ass'n v. National Labor Rel. Bd.,* 202 F. 2d 606, it was said that the provisions of section 8 (b) (4) are violated only when the employees of a neutral employer are induced or encouraged to strike or engage in a concerted refusal in the course of their employment to handle certain materials where an object thereof is to force the neutral employer to cease doing business with the primary employer or cease handling such employer's products.

In discussing section 8 (b) (4), the court, in *Retail Fruit & Veg. Clerks U. v. National Labor Rel. Bd.,* 249 F. 2d 591, said at page 594:

"As we understand this statute there are two necessary requirements to find a violation of it. These are: (1) Independent *neutral employers* . . ., and (2) the union must have as an object of its picketing (or other activity) the inducement or encouragement of the *neutral employees* to engage in a concerted refusal to work for their *neutral employer,* so that the neutral employer will cease doing business with the *primary employer,* which indicates that the neutral employer must be doing some sort of business with the primary employer."

Thus, it is clear that in order for there to be a violation of section 8 (b) (4) such as will vest exclusive jurisdiction in the NLRB, the picketing must be aimed at an independent neutral employer and the object of the picketing must be to induce or encourage the employees of the neutral employer to engage in a strike or other concerted refusal in the course of their employment to handle certain products where the object thereof is to force the neutral employer to cease handling such products or to cease doing business with the primary employer. The coercion by the union must be directed at the neutral employees before it can be declared a violation of sec-

tion 8 (*b*) (4). Coercion or threats addressed directly to the neutral employer are not within the proscription of the statute. (*Rabouin v. National Labor Relations Board,* 195 F. 2d 906, 911, 912;. *Adams Dairy v. Burke,* supra, p. 294; *Milwaukee Boston Store Co. v. Amer. Fed. of H. W.,* supra, p. 773.)

We have already determined that the Association is a neutral employer and must now determine whether the picketing meets the' second requirement. We do not think so. In the first place, the object of the picketing was not to induce or encourage concerted activity on the part of the Association's employees and, in fact, such employees did not engage in any concerted activity. They continued to work even though they were required to cross defendants', picket lines in order to do so. It is true that certain drivers of truck lines serving the Association refused to cross the picket lines, but even then there was no concert of action on their part, inasmuch as some of such drivers did cross the picket lines. Furthermore, the. drivers of the trucks were *not employees of the Association.*

In the second place, as we have previously stated, there is nothing in the evidence which indicates that the Association was doing business with CCA. The neutral employer must be doing some business with the primary employer or there is no violation of section 8 (*b*) (4). (*Retail Fruit & Veg. Clerks U. v. National Labor Rel. Bd.,* supra.)

The picketing was therefore neither protected nor prohibited by the Act, and, as we have stated above, under the circumstances state courts are free to exercise jurisdiction. It follows that the temporary restraining order was rightfully issued and the trial court erred in sustaining defendants' demurrer to plaintiff's evidence. Consequently, defendants are not entitled to attorney fees as an item of damages. The judgment of the trial court is reversed and the cause is remanded in case No. 41,422 and case No. 41,421, with instructions to enter judgment for the plaintiff.

It is so ordered.