EX PARTE SHERMAN D. GEORGE

No. A-8518.   Decided January 3, 1962
358 S.W. 2d 590

104

CHIEF JUSTICE CALVERT and ASSOCIATE JUSTICE NORVELL dissented from denial of motion for rehearing.

*Mandell & Wright, Tom Kirtley* with firm, Houston, for relators.

*Baker, Botts, Andrews & Shepherd, John B. Abercrombie* of above firm, Houston, *Armstrong, Bedford & Lambdin,* Galveston, for respondent.

ASSOCIATE JUSTICE SMITH delivered the opinion of the Court.

This is an original habeas corpus proceeding wherein petitioner S. D. George seeks release from a conviction for contempt. George claims that the temporary injunction granted by the 10th Judicial District Court of Galveston County, Texas, is and was void because the Court was without jurisdiction to order the injunction. George contends, therefore, that his single act of picketing in "violation" of the injunction cannot be made the basis of a contempt conviction, since it was, at most, a "violation" of a void order.

The contempt proceeding originated in the district court upon the motion of The American Oil Company, wherein it was alleged that George and National Maritime Union of America, AFL-CIO, were in contempt and disobedience of the Court's prior order granting a temporary injunction and of the writ of temporary injunction issued pursuant thereto.

On July 3, 1961, the hearing on the motion proceeded to trial. The matter was submitted to the Court on the pleadings and stipulated facts.

After considering the motion alleging that George and National Maritime Union of America, AFL-CIO, were in contempt of court, and the lawful evidence, and stipulation of the parties, the Court adjudged the Union not guilty of contempt. Although American duly excepted to such action of the Court, the question so far as the Union is concerned is not before this Court for review.

However, the Court ordered, adjudged, and decreed George guilty of contempt of court "* * * by intentional and wilful disobedience and violation of a valid subsisting writ of temporary injunction lawfully issued and theretofore duly served upon him pursuant to a lawful subsisting order of this Court, in that Sherman D. George, while said writ of temporary injunction was in full force, * * * picketed The American Oil Company refinery entrance located at and known as the Main Gate on Fifth Avenue South in the City of Texas City, Galveston County, Texas, by the said Sherman D. George repeatedly and continuously walking back and forth on the roadway across and in close proximity in front of that refinery entrance while carrying and

displaying a large sign on which the following words were printed in large and clearly legible letters:

'N. M. U. Members will not sail without a contract. This protest against The American Oil Company only. NATIONAL MARITIME UNION OF AMERICA, AFL-CIO.' "

The court found that such picketing at that time by George had been explicitly enjoined by the following provisions of the temporary injunction:

"NOW, THEREFORE, you the said National Maritime Union of America, AFL-CIO, Sherman D. George, and all of the officers, agents, representatives and members of said National Maritime Union of America, AFL-CIO, and those acting in concert with you, are hereby restrained and enjoined from picketing the refinery entrances located and known as the Main Gate on Fifth Avenue South, and the Grant Avenue Parking Lot Gate on Grant Avenue, both in the City of Texas City, and County of Galveston, Texas, serving the refinery of The American Oil Company at Texas City, Texas, * * *."

The pertinent findings of fact by the trial court based upon the record and the stipulated facts by the parties are these:

"3.

"At the time the order granting temporary injunction referred to in 2. above was in open court rendered by the Court, Sherman D. George was personally present in the court room, and Sherman D. George fully understood the provisions and effect of, and the reasons for, the aforesaid order granting temporary injunction."

"7.

"At 2:55 o'clock P.M., on June 23, 1961, R. F. Nunn, a duly authorized Deputy of J. B. Kline, duly elected and qualified Sheriff of Galveston County, Texas, personally served a true copy of the aforesaid writ of temporary injunction referred to in 5. above on the N.M.U., and a similar copy on Sherman D. George, by personally handing both of said copies to Sherman D. George at Galveston, Texas, Sherman D. George then being Port Agent at Galveston of the N. M. U. and as such being a proper agent for service of such writ on the N. M. U.

"8.

"Subsequent to the service on him of the writ of temporary injunction, as referred to in 7. above, and on June 23, 1961, Sherman D. George read the provisions of the writ of temporary injunction and fully understood the provisions thereof; and thereafter, but prior to June 27, 1961, Sherman D. George publicly announced in effect that he intended to violate the provisions of the aforesaid temporary injunction by picketing at The American Oil Company refinery at Texas City because he did not believe that this Court had jurisdiction to issue the order granting the temporary injunction.

"9.

"Therefore, and without any inducement or agreement thereto by The American Oil Company, * * * on the 27th day of June, 1961, Sherman D. George went to The American Oil Company refinery entrance, located at and known as the Main Gate on Fifth Avenue South" and picketed that refinery gate as heretofore indicated.

"10.

"George at all times knew that the Court's order and the temporary injunction were in effect and had not been modified or set aside either in whole or in part.

"15.

"The Court further finds that there is in the record before the Court no circumstance in mitigation of the actions of Sherman D. George * * *.

"16.

"The Court further finds that the following facts were true on June 20, 1961, at the time The American Oil Company filed in the above numbered and styled cause its petition seeking the temporary injunction that is involved in this hearing, and were true on June 22, 1961, at the time of the hearing on the application for temporary injunction, and at the time of the issuance and service on Sherman D. George and the N. M. U. of the writ of temporary injunction that is involved in this hearing, and were true at all intermediate times and at all other times material to the issues involved in this hearing:

"a.  The N. M. U. is and was an unincorporated voluntary association of members operating as a labor union, of which Sherman D. George was a member and its Port Agent in the City and County of Galveston, Texas, having authority to supervise the affairs, including picketing, of the N. M. U. in Galveston County, Texas, the said Sherman D. George then and now being a resident citizen of Galveston County, Texas.

"b.  The American Oil Company is and was a Texas Corporation which owned and operated a refinery located on approximately 860 acres of land at Texas City, Galveston County, Texas, the entirety of which is surrounded by a fence, and entrance to that refinery could be gained only through six certain gates. Two of those gates were used exclusively by employees of The American Oil Company, which gates were located at and were known as the Main Gate on Fifth Avenue South, and the Grant Avenue Parking Lot Gate on Grant Avenue, both in Texas City, Texas. Of the four remaining gates, one or more were used by employees of independent contractors engaged in construction work on the refinery property.

"c.  The American Oil Company had in its employ approximately 1,500 employees working for it at the aforesaid refinery, of whom approximately 1,100 were classified as operation and maintenance employees, or production and maintenance employees, which is one and the same. The approximate daily payroll of the approximately 1,100 operation and maintenance employees was $25,000.00 per day.

"d.  Oil, Chemical and Atomic Workers International Union, Local 4-449 (hereafter called O.C.A.W.) was a labor union which had been selected by the operation and maintenance employees of The American Oil Company at its Texas City refinery for the purpose of collective bargaining.

"e.  There was a valid and subsisting labor agreement which had been arrived at between The American Oil Company and O.C.A.W. relating to the approximately 1,100 operation and maintenance employees of The American Oil Company at its Texas City refinery, which agreement was entered into on January 8, 1960, and will be effective until at least June 30, 1962.

"f.  There was no labor dispute between The American Oil Company and O.C.A.W. or the operation and maintenance

employees of The American Oil Company represented by O.C.A.W.

"g. The N.M.U. had its pickets on 24-hour duty posted at all six of the gates at the entrances to The American Oil Company refinery at Texas City, including at the Main Gate and the Grant Avenue Parking Lot Gate, which gates were used exclusively by The American Oil Company refinery employees, including the approximately 1,100 operation and maintenance employees working for The American Oil Company under the aforesaid valid subsisting labor agreement.

"h. A primary purpose of the N. M. U. and of Sherman D. George, the Port Agent of N. M. U. whose duties included supervising N. M. U. pickets in Galveston County, Texas, in posting pickets at the Main Gate and at the Grant Avenue Parking Lot Gate of The American Oil Company refinery at Texas City as referred to in g. above, and a natural and probable consequence thereof, was to secure the disregard, breach or violation by O.C.A.W. and by all or substantial numbers of the operation and maintenance employees of The American Oil Company at its Texas City refinery of the valid subsisting labor agreement referred to in e. above.

"i. At the time the order granting the temporary injunction referred to in Finding 2. above was rendered, and at the time of the issuance and service of the writ of temporary injunction referred to in Finding 5. above, there was a clear and present danger that the picketing of the Main Gate and Grant Avenue Parking Lot Gate would secure the disregard, breach or violation of the aforesaid labor agreement between The American Oil Company and O.C.A.W. by O.C.A.W. and by all or substantial numbers of The American Oil Company employees covered by that labor agreement, and in the event of such disregard, breach or violation immediate and irreparable harm and damage would have resulted to The American Oil Company.

"j. The temporary injunction against picketing the Main Gate and the Grant Avenue Parking Lot Gate of The American Oil Company refinery at Texas City did not in any manner interfere with any of the defendants picketing the other four gates at that refinery.

"k. The Americon Oil Company is a wholly owned subsidiary of American Oil Company, a Maryland corporation,

and said American Oil Company, a Maryland corporation, directs and controls all of the activities of said The American Oil Company and its Texas City, Texas, refinery. At all times material hereto, American Oil Company, a Maryland corporation, was engaged in a labor dispute with its employees represented by the National Maritime Union of America, AFL-CIO. The American Oil Company, a Texas corporation, and American Oil Company, a Maryland corporation, at all times material hereto, were engaged in commerce within the meaning of the National Labor Relations Act, as amended, and met the existing monetary jurisdictional standards of the National Labor Relations Board."

The Court filed Conclusions of Law as follows:

"1. This Court has jurisdiction of the subject matter of the contempt motion before this Court, and of the parties thereto.

"2. This Court has, and since the inception of this suit has had, jurisdiction of the subject matter of this suit by The American Oil Company against the parties defendant therein, and at the time of the hearing on the application for temporary injunction had and has retained personal jurisdiction over the parties thereto.

"3. The labor agreement between The American Oil Company and Oil, Chemical and Atomic Workers International Union, Local 4-449, referred to in Finding of Fact 16.e above was a valid subsisting labor agreement within the meaning of Article 5154d, Sec. 4, Vernon's Texas Rev. Civ. Stats., Ann.

"4. The picketing at the Main Gate and at the Grant Avenue Parking Lot Gate was in direct violation of Article 5154d, Sec. 4, Vernon's Texas Rev. Civ. Stats., Ann., in that it was, within the language and meaning of that statute:

"* * * picketing, the purpose of which, directly or indirectly, is to secure the disregard, breach or violation of a valid subsisting labor agreement arrived at between an employer and the representative designated or selected by the employees for the purpose of collective bargaining, or certified as the bargaining unit under the provisions of the National Labor Relations Act", and as such was within the jurisdiction of this Court to prohibit by temporary injunction.

"5. The actions of Sherman D. George, as found in Finding of Fact 9. above, constitute a disobedience by Sherman D. George of the lawful writ of injunction duly issued by the District Clerk of Galveston County, Texas, pursuant to the valid subsisting order of this Court, as the term 'disobedience of an injunction' is used in Rule 692 of Texas Rules of Civil Procedure.

"6. The acts of disobedience referred to in Conclusion 5. above constitute a contempt of this Court by Sherman D. George within the meaning of Texas Rules of Civil Procedure, Rule 692, and Article 1911, Vernon's Texas Rev. Civ. Stats., Ann.

"7. The motion of The American Oil Company and the affidavit therein contained are in every respect legally sufficient, and all procedural requirements have in every respect lawfully been complied with, so as in every legal aspect to authorize this hearing, and the findings, conclusions, orders and commitment herein provided."

■ George contends that the findings of fact by the trial court, based largely upon stipulated facts, demonstrate conclusively that both Relator's conduct made the basis of his conviction for contempt, and that of other pickets, previously made the basis for the temporary injunction he "violated", are *arguably* within Section 7 [1] or Section 8[2] of 29 U.S.C.A., the National Labor Management Relations Act. He argues that conduct which arguably is either within the protection or the prohibition of the

---

1. Sec. 7. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3)."

2. Sec. 8 "(b) It shall be an unfair labor practice for a labor organization or its agents - - -
* * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: * * *

"(B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title; * * *."

National Labor Management Relations Act lies in an area pre-empted by the United States and therefore is beyond the power of a state court to enjoin. However, George does not direct our attention to any particular part of either Section 7 or Section 8 of the Act which arguably embraces his activities, and we find none. A bare assertion of pre-emption does not deprive a state court of jurisdiction. See Retail Clerks Union v. Superior Court, 52 Cal. 2d 222, 339 P. 2d 839 (1959), Cert. den. 361 U.S. 864 (1959). It is well settled that labor activity neither pro-tected nor prohibited by the National Labor Relations Act is within the power of the states to regulate by injunction. See Auto Workers v. Wisconsin Board, 336 U.S. 245 (1949); Weber v. Anheuser-Busch, Inc., 348 U.S. 468 (1955), 75 S. Ct. 480, 99 L. Ed. 546; Office Employees International Union v. Houston Lighting & Power Company, Texas Civ. App. (1958), 314 S.W. 2d 315, er. ref. n.r.e.

■ When, in a case such as we have here, the plaintiff alleges that the picketing sought to be enjoined is neither protected nor prohibited by the National Labor Relations Act, it is the duty of the trial court to determine initially whether it has jurisdic-tion. Ex Parter Twedell, supra. The state courts in determining the question of whether activity sought to be enjoined falls within the neither-protected nor-prohibited category necessarily must be guided by certain standards. The United States Supreme Court in the "Second Garmon Decision", Building Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 780, 3 L. Ed. 2d 775, specified the standards to be followed in determining this ques-tion. Under these standards, the state courts are to determine that they have no jurisdiction of labor activity which is *"arguably* subject to Sec. 7 or Sec. 8 of the Act". [Emphasis added.] Writ of Certiorari, 357 U.S. 925, 2 L. Ed. 1369, 78 S. Ct. 1371, was granted in the "Second Garmon Case" to determine whether a California court had jurisdiction to award damages arising out of peaceful union activity which it could not enjoin. The court stated that the issue before it was a variant of a familiar theme. The problems presented in cases beginning with Allen Bradley Local, U.E.R.M.W. v. Wisconsin Employment Relations Board, 315 U.S. 740, 86 L. Ed. 1154, 62 S. Ct. 820, were reviewed. The court recognized that many of these problems probably could not have been foreseen by the Congress. The court, in reaffirming what it had said in Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 99 L. Ed. 546, 75 S. Ct. 480, said:

"When it is clear or may fairly be assumed that the activi-ties which a state purports to regulate are protected by Sec.

7 of the National Labor Relations Act, or constitute an unfair labor practice under Sec. 8, due regard for the federal enactment requires that state jurisdiction must yield. * * * At times it has not been clear whether the particular activity regulated by the states was governed by Sec. 7 or Sec. 8, or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a state's power and state jurisdiction too must yield to the exclusive primary competence of the Board. * * * It is not for us to decide whether the National Labor Relations Board would have, or should have, decided these questions in the same manner. *When an activity is arguably subject to Sec. 7 or Sec. 8 of the Act, the states as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.* To require the states to yield to the primary jurisdiction of the National Board does not ensure Board adjudication of the status of a disputed activity. If the Board decides, subject to appropriate federal judicial review, that conduct is protected by Sec. 7, or prohibited by Sec. 8. then the matter is at an end, and the states are ousted of all jurisdiction." [Emphasis added].

■ The failure of the Board to define the legal significance under the Act of a particular activity does not give the states the power to act. The controlling consideration, announced in Garmon, is that to allow the states to control activities that are *potentially* subject to federal regulation involves too great a danger of conflict with National Labor policy. However, the fact alone that the National Labor Relations Board has not adjudicated the status of the conduct involved does not mean that the state courts cannot act. We construe the Garmon case to mean, and we so hold, that if the activity in question is not *arguably* within the compass of Sec. 7 or Sec. 8 of the Act, the state's jurisdiction is not displaced even though the Board has not adjudicated the status of the activity. To hold otherwise would unduly frustrate the state courts in the exercise of their right to adjudicate issues properly within the jurisdiction of such courts. The very fact that the dividing line between what is reasonably arguable and what is not is oftentimes difficult to determine is a cogent reason for basing the determination upon the particular facts of each given case. At the time of the picketing made the basis of the temporary injunction, Relator's union,

National Maritime Union (hereinafter called NMU), represented the seamen employed by the American Oil Company on its seagoing tankers. After going on strike for a new contract NMU set up picket lines at, among other places, American's refinery at Texas City, Texas. The employees of the refinery were represented by another union, Oil, Chemical & Atomic Workers Union, Local 4-449 (hereinafter called "OCAW"). OCAW and American at the time had a valid, subsisting labor agrement containing a no-strike clause, and there was no labor dispute at the refinery. Although aware of the existence of this no-strike agreement, NMU picketed the gates of the refinery used by the OCAW employees, *with the intention of inducing such employees to honor the picket line, thereby breaching their contract.* Article 2 of this contract reads:

> "There shall be no strikes or stoppages of work by the Union, or lockouts by the Company, so long as this agreement is in effect."

A primary purpose, as found by the trial court, of the NMU and of Sherman D. George, the Relator (whose duties included supervising NMU pickets in Galveston County, Texas), *in posting pickets at the Main Gate and the Grant Avenue Parking Lot Gate of the American Oil Company refinery, and a natural and probable consequence thereof, was to secure the disregard, breach or violation by OCAW, and by all or substantial numbers of the production and maintenance employees of the American Oil Company at its Texas City refinery of the valid and subsisting labor agreement that was then in force between them.*

There was no dispute as to the evidence introduced at the hearing on the temporary injunction relating to the irreparable effects of work stoppage by OCAW at the refinery. The refinery operates continuously, 24 hours a day, 7 days a week. It supplies products essential to the operation of several other plants in Texas City, and such plants have no readily available substitute source for these materials. The continuous operation of the plant depends on the presence of OCAW production and maintenance workers on each eight-hour shift, and if a substantial part of any shift had honored NMU's picket line it would have necessitated shutting down the entire operation. The evidence further shows that shutting down the refinery is a complicated, time-consuming, and extremely dangerous procedure. It would have required at least a week to bring the refinery back to full production following a shutdown, and would have required several months to return to normal operations because of the inevitable

disruption in schedules and loss of business. The evidence amply supports the trial court's findings that at the time the injunction was granted there was a clear and present danger of irreparable harm and damage resulting had the picketing of the Main Gate and the Grant Avenue Parking Lot Gate not been restrained by injunction. In spite of this certain result, the Relator, George, publicly announced that he intended to violate the provisions of the injunction—this, solely because he did not believe that the trial court had jurisdiction to issue the injunction. It should be noted that the injunction here involved was limited in its terms to picketing at the Main Gate and at the Grant Avenue Parking Lot Gate, which gates were used exclusively by employees of The American Oil Company, including those represented by OCAW. The injunction did not in any manner interfere with George or any others picketing at the other four gates of the refinery. These gates were used by employees of independent contractors working at the refinery, which gates are referred to as the "construction gates". With reference to the construction gates, American filed a charge with the National Labor Relations Board alleging that NMU was engaged in secondary picketing in violation of Section 8, (b) (4) (B) of the Act (29 U.S.C.A., Sec. 158 (b) (4) (B)) by picketing the four construction gates The National Labor Relations Board filed a complaint under Section 10 (1) of the Act to enjoin NMU's picketing of only the four construction gates. This charge was based on the theory that such picketing induced or encouraged the employees of certain building contractors to engage in a work stoppage. This controversy was settled and a stipulation was filed in Civil Action No. 2783 in the United States District Court, whereby without admitting any violation of the Act, NMU agreed not to picket the construction gates so long as they were maintained for the exclusive use of employees of the independent contractors.

Relator, George, insists that since American invoked the jurisdiction of the National Labor Relations Board over the dispute with reference to the construction gates, the Board also has exclusive jurisdiction over the activity in picketing the Main Gate and the Grant Avenue Parking Lot Gate. With this we cannot agree. The matters involved in the complaint filed by the National Labor Relations Board in no manner had reference to the Main Gate and the Grant Avenue Parking Lot Gate, but only had reference to the four construction gates. That complaint had nothing to do with the injunction suit filed by American to enjoin Relator, George, from picketing the Main Gate and Grant Avenue Parking Lot Gate, and thereby bring about a breach of the contract above mentioned.

George argues that no OCAW member employed by American actually refused to cross the NMU picket line, and that no violence attended the picketing. The fact that the picketing was without violence, and that no OCAW member actually refused to cross the NMU picket line does not necessarily mean that the temporary injunction was improvidently granted. The evidence is sufficient to support the trial court's action in granting the injunction if it shows that the purpose of the picketing was to directly or indirectly secure the disregard, breach, or violation by OCAW members of a valid subsisting labor agreement.

The evidence of the activity of Relator, George, in the picketing of the two gates shows that this test was met, and supports the trial court's unchallenged finding that such activity was in direct violation of Article 5154d,[3] Vernon's Annotated Civil Statutes. George admitted that he deliberately did what the statute prohibits. His position presents a facet of the problem of federal pre-emption of jurisdiction over labor activity, which has not been previously considered by this Court. Certainly, the precise question was not presented in either the Twedell or Dilley cases. We have here a situation where the Relator, George, deliberately set about to picket and thereby cause a breach of a labor agreement between the American and OCAW.

The case of Grunwald-Marx, Inc. v. Clothing Workers, 52 Cal. 2d 568, 343 P. 2d 23 (1959), by the California Supreme Court, supports our conclusion that the labor activity here is neither protected nor prohibited by the National Labor Relations Act. In that case, the Court held that its jurisdiction to confirm an arbitration award in favor of an employer was not pre-empted by the Act, even though the employer had filed charges with the Board alleging the Union had failed to bargain in good faith on the controversy underlying the arbitration case. The Court's reasoning on the pre-emption issue is sound. The Court said:

"As already pointed out, in the instant case the state action charges the breach of an express term of a collective bargaining agreement. Such conduct does not involve a violation of Sections 7 or 8 of the Act. The refusal to bargain collectively, which is the gist of the proceeding before the National Labor Relations Board, is involved, at most, indirectly in the state action. There is no obvious conflict between them. The Union

3. "* * * picketing, the purpose of which, directly or indirectly, is to secure the disregard, breach or violation of a valid subsisting labor agreement arrived at between an employer and the representatives designated or selected by the employees for the purpose of collective bargaining, or certified as the bargaining unit under the provisions of the National Labor Relations Act."

contends that whenever there is a mere possibility of potential conflict between the substantive law, remedies or procedures of the state and federal authorities, the National Labor Relations Act pre-empts jurisdiction. That assertion is too broad. The real test is to ascertain the nature of the activity or conduct that is involved. The Supreme Court of the United States was most careful to point out that in cases of violent conduct or threats to the peace, state courts have jurisdiction. Reference is also made to an area 'where the activity regulated was a merely peripheral concern of the Labor Management Relations Act'. These are referred to as situations touching interests 'deeply rooted' in 'local feeling' or 'responsibility'. As to these, state jurisdiction is retained. It is true that Garmon held that when 'an activity is arguably subject to Sec. 7 or Sec. 8 of the Act' the Board has exclusive jurisdiction in the first instance. But certainly by using the term 'arguably' Mr. Justice Frankfurter did not mean to imply that a litigant can cause a state court to lose jurisdiction merely by the assertion that the particular activity is either protected by Sec. 7 or prohibited by Sec. 8. He must have meant 'susceptible of reasonable argument'. Otherwise, completely specious claims of activities within Board jurisdiction would automatically deprive state courts of jurisdiction until the Board has acted. No such result was intended. The fact that the dividing line between what is reasonably arguable and what is not, may, in some cases, be difficult to determine, is no reason for refusing to make the determination. Courts constantly make such determination. No doubt close cases should be determined, in the first instance, to fall exclusively within Board jurisdiction. But this is not such a case.

"Our analysis of the conduct here involved has already been stated. The 'activity arguably subject to Sec. 7 or Sec. 8 of the Act', to use Mr. Justice Frankfurter's words in Garmon, is entirely distinct from the activity constituting the breach of contract. State court or arbitration resolution of the alleged breach of contract will not conflict with Board action on the unfair labor practice. Indeed, the state does not purport to regulate the latter. A Board ruling that there has not been a refusal to bargain is not inconsistent with an award of damages or other relief for a breach of contract, and conversely, a Board ruling that there has been a refusal to bargain is not in conflict with a judicial determination or determination by an arbitration board that the contract has not been breached.

"We emphasize that this is not a situation where the same

act constituting a breach of contract is also an unfair labor practice. As to such a situation we express no opinion.

"Conflict between state and federal jurisdiction, actual and potential, is the theme of Garmon. Lack of such conflict necessarily precludes the possibility of pre-emption. State court enforcement of the contract breach is consonant and not inconsistent with the national policy of industrial relations. At the very most, the contract breach '[is] a merely peripheral concern' of the federal statute. * * *." See also Retail Clerks Union v. Superior Court, 52 Cal. 2d 222, 339 P. 2d 839 (1959), cert. den. 361 U.S. 864 (1959).

Relator refers to our opinion in Ex Parte Dilley, supra, wherein we said: "There now seems to be four means or circumstances under which a state court will be held to have power to regulate, although it would not or might not otherwise be empowered in light of federal pre-emption." He contends that none of the four circumstances exist in the instant case. It should be noted that the four means or circumstances we mentioned were stated in more or less general terms. We did not mean to place a limitation upon the circumstances under which a state court will be held to have power to regulate. However, an activity which is designed to secure the disregard, breach, or violation of a valid and subsisting labor agreement, falls well within circumstance "(2) where the activity is of merely 'peripheral concern' of the Labor Management Relations Act, * * *." This simply means that the instant case falls in a class where pre-emption does not apply. A bare assertion of pre-emption did not and does not oust a state court of jurisdiction. This case is one in which Relator's claim of pre-emption is not "susceptible of reasonable argument". Grumwald-Marx, Inc., supra.

■ We find no basis for denying to Texas the power, in governing her internal affairs, to regulate a course of conduct about which the National Labor Relations Board, at most, merely has a "peripheral concern". We find nothing in the Act which can be regarded as protecting concerted activities which have as their purpose possible and probable inducement of breach of contract. The activities in the instant case, neither being protected nor prohibited by the Act, do not fall within any of the categories in which the United States Supreme Court thus far has said a state court may not act. See Auto Workers v. Wisconsin Board, 336 U.S. 245, 265, 23 LRRM 2361 (1949).

The order adjudging Relator, Sherman D. George, guilty of

contempt of court, rendered by The Honorable Donald M. Markle, Judge of the Tenth District Court of Galveston County, Texas, and adjudging that Sherman D. George be imprisoned in the County Jail of Galveston County, Texas, without bail, for a period of seventy-two (72) hours, and until a fine of $100.00 is paid, or until discharged by further order of the Court, is not void. Therefore, Relator, George, is remanded to the Sheriff of Galveston County, Texas, until he has served the seventy-two (72) hours and paid the $100.00 fine, as ordered by the trial court.

Opinion delivered January 3, 1962.

CHIEF JUSTICE CALVERT, dissenting.

Further consideration of this matter has convinced me that relator should be discharged. Being thus convinced, I must dissent.

One may not be punished for contempt for violating a void court order, and a temporary injunction granted by a court having no jurisdiction of the subject matter is void. Ex Parte Twedell, 158 Texas 214, 309 S.W. 2d 834; Ex Parte Dilley, 160 Texas 522, 334 S.W. 2d 425.

There is in the record ample evidence to support the trial court's finding that a primary purpose of the picketing of the refinery at Texas City by NMU members was to induce OCAW members to breach their contract with their employer, and the finding is not questioned by Relator. The picketing was, therefore, in direct violation of Sec. 4 of Article 5154d, V.A.T.C.S., and of the public policy of this state as declared by that statute. It is my considered judgment, however, that the District Court was without jurisdiction to enjoin the picketing, however unlawful under state statute its primary purpose may have been.

It is now too well settled to admit of serious question, or to require citation of decided cases, that exclusive primary jurisdiction of labor-management controversies involving activities protected by Section 7 or prohibited by Section 8 of the Labor Management Relations Act, Title 29, Secs. 157, 158, U.S.C.A., is pre-empted to and vested in the National Labor Relations Board. The pre-emption extends not only to controversies involving those activities which are expressly or clearly protected or prohibited, but as well to controversies involving those which *arguably* may be protected or prohibited. San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L. Ed. 2d 775.

The majority here, using language from Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers of America, 52 Cal. 2d 568, 343 P. 2d 23, which in turn quotes from San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L. Ed. 2d 775, conclude that jurisdiction to control the concerted activity by NMU is not preempted because the matter at issue is a merely *peripheral concern* of the Labor Management Relations Act. I can find no sound basis for that conclusion.

The statement of the Supreme Court of the United States that jurisdiction is not pre-empted in matters of merely peripheral concern of the LMRA must be interpreted in the factual context in which it was made. It was not intended as an escape phrase for ceding to state courts jurisdiction to control peaceful picketing. The statement was made in referring to International Assoc. of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L. Ed. 2d 1018, in which it was held that jurisdiction of state courts to award damages to a member against his union for wrongful expulsion had not been pre-empted. It was pointed out in the opinion in *Gonzales* that "the protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been undertaken by federal law, and indeed the assertion of any such power has been expressly denied"; that "The National Labor Relations Board could not have given respondent the relief that California gave him according to its local law of contracts and damages," and that the possibility of conflict with remedies afforded under the LMRA was "remote". The predicate for denying pre-emption in *Gonzales* does not exist in this case. Far from being of merely peripheral concern, regulation of strikes and picketing is the very heart of the Labor Management Relations Act.

There is far more to the second *Garmon* decision than reference in the opinion of the majority to matters of "peripheral concern". Not a single Justice of the Supreme Court dissented from the conclusion that the courts of California had no jurisdiction to adjudicate the issues raised in the case. The Court divided five to four on the proper basis for the conclusion. Mr. Justice Frankfurter wrote the opinion for the Court and Mr. Justice Harlan wrote the opinion for the concurrers. Because the division in the Court is so precarious, it may be well to consider the issue in this case in the light of both opinions.[1]

---

1. There is an excellent analysis of the two opinions by Charles O. Gregory, Professor of Law at the University of Virginia, in 46 Va. Law Review 539. See also case note in 58 Mich. Law Review 288.

The controlling part of the Frankfurter opinion, as relevant to a decision of the issue of jurisdiction in this case, is found in the following language (359 U.S. 244-246, 3 L. Ed. 2d 783-784) :

"At times it has not been clear whether the particular activity regulated by the States was governed by Sec. 7 or Sec. 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. *It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board.* [cases cited] * * *.

"To require the States to yield to the primary jurisdiction of the National Board does not insure Board adjudication of the status of a disputed activity. If the Board decides, subject to appropriate federal judicial review, that conduct is protected by Sec. 7, or prohibited by Sec. 8, then the matter is at an end, and the States are ousted of all jurisdiction. Or, the Board may decide that an activity is neither protected nor prohibited, and thereby raise the question whether such activity may be regulated by the States. * * * *In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction.* * * *"

The injunction put upon us by that clear and unmistakable language is to yield to the N.L.R.B. primary jurisdiction to decide whether a particular labor-management activity is protected or prohibited by the LMRA *unless* it has already been decided by "compelling precedent" that it is neither. As I read the Court's language, in the absence of "compelling precedent" that a particular activity is neither prohibited nor protected, primary jurisdiction to decide whether it is one or the other, or neither, rests with the N.L.R.B. We are not told what is regarded as "compelling precedent". To me it means a decision by the Supreme Court of the United States or such a series of unreversed or unchallenged decisions by the N.L.R.B. of the identical question that the decisions are accepted as foreclosing the question. Assuming that is a close approximation of what the Court means by "compelling precedent", it would perhaps suffice as a dissent to observe at this point that the N.L.R.B. was not afforded an opportunity to decide whether the activity enjoined by the trial court is prohibited or protected

by the LMRA, or neither, and there is no compelling precedent establishing that it is neither. That, or its equivalent, is, in my judgment, about all the Supreme Court of the United States would say if this case were before it for decision. However, since The American Oil Company strenuously challenges the correctness of that conclusion, I am inclined to do more than state it as an ipse dixit.

The only prohibitory provisions of the LMRA which seem in the least applicable are Section 8 (b) (1) (A) which makes it an unfair labor practice for a labor organization or its agents to coerce employees in the exercise of the right given them by Section 7 *to refrain* from engaging in "concerted activities for the purpose of collective bargaining or other mutual aid or protection", and Section 8 (b) (4) (i) (B) which makes secondary picketing an unfair labor practice.

The trial court found, that "a natural and probable consequence" of the picketing, if continued, would have been a breach by substantial numbers of OCAW members of their contract. It might seem that an activity which would have such coercive effect on the minds of men as to cause them to breach a contract and thereby become subject to discharge, N.L.R.B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L. Ed. 832, would fall within the prohibition of Sec. 8(b) (1) (A), but the Supreme Court of the United States has held, in a slightly different factual context, that peaceful picketing is not coercive within the meaning of that Section. National Labor Relations Board v. Drivers, Chauffeurs, Helpers, Local Union No. 639, etc., 362 U.S. 274, 80 S.Ct. 706, 4 L. Ed. 2d 710. There is a compelling precedent, therefore, for holding that the picketing is not prohibited by Section 8(b) (1) (A).

Whether it is prohibited by Section 8(b) (4) (i) (B) is not quite so free of doubt. While here, again, the picketing seems to be within the literal wording of the definition of the unfair labor practice[2] if we regard the companies as separate legal entities,

---

2. "(b) It shall be an unfair labor practice for a labor organization or its agents—(4)(i) * * * to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services * * * where * * * an *object thereof is*— * * * (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * * *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;"

it is generally held that the prohibition is directed at secondary activity and is designed for the protection of neutrals. The finding of the trial court negatives the status of The American Oil Company as a neutral. The finding is: "The American Oil Company is a wholly owned subsidiary of American Oil Company, a Maryland Corporation, and said American Oil Company, a Maryland Corporation, directs and controls all of the activities of said The American Oil Company and its Texas City, Texas, Refinery." The finding is unchallenged and undisputed.

In the only factually similar case my research has disclosed, the United States Court of Appeals for the 7th Circuit held that picketing of a wholly-owned subsidiary was not prohibited by Section 8(b) (4) (A), the applicable provision before amendment of the Act in 1959. See Milwaukee Plywood Company v. N.L.R.B., 285 F. 2d 325. The same conclusion was reached by the United States District Court for the Eastern District of Wisconsin in the same controversy. See Madden v. Warehouse and Mail Order Employees Union, International Brotherhood of Teamsters, etc., 36 Labor Cases 65,708. The opinions disclose that the NLRB thought the activity was not prohibited. In that case there was evidence of control by Aetna of practically all operational details of Milwaukee's business, including control of its policy in dealing with the picketing. In somewhat analogous fact situations where evidence of control was not so conclusive, Courts of Appeals have reached a different conclusion from that reached in *Aetna-Milwaukee*. In Bachman Machine Company v. N.L.R.B., 8th Circuit, 266 F. 2d 599, the Court, with one judge dissenting, held that a union representing the employees of a family-owned corporation committed an unfair labor practice in violation of Section 8 (b) (4) (A) when it picketed the separate place of business of another corporation whose stock was wholly owned by the same family and whose employees were represented by a different union. There was considerable evidence of common control, but the Court concluded that the "evidence fell short of establishing that both companies were under such actual common management or control as to make them allies and a single employer for the purposes of Section 8 (b) (4) (A) of the Act." To the same effect, see J. G. Roy & Sons Company v. N.L.R.B., 1st Circuit, 251 F. 2d 771. As holding that picketing of a separate employer who is an "ally" of the primary employer does not violate Section 8 (b) (4) (i) (B), see N.L.R.B. v. Business Machine, etc., 2nd Circuit, 228 F. 2d 553. The cases on the subject would seem to lead to a fairly firm conclusion that picketing by a union representing employees of one corporation of the premises of a second corporation is not a violation of Section 8 (b) (4) (i) (B)

if the businesses of the two corporations represent a "straight-line" operation or if the activities of the two corporations are under common ownership *and* actual common control. Irwin-Lyons Lumber Co., 87 N.L.R.B. 54.

In this case the trial court found, and it is uncontroverted, that The American Oil Company is a wholly-owned subsidary of American Oil Company and that *all* of its activities, presumably including labor activities, were directed and controlled by the parent corporation. Based on the cases noted, I am inclined to the opinion that picketing of The American Oil Company refinery by NMU was not prohibited by Section 8 (b) (4) (i) (B), but I have found no compelling precedent to that effect. The question remains as to whether there is any compelling precedent for holding that the picketing is not protected by Section 7 which guarantees to employees and their union the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection."

It is to be remembered that the picketing was entirely peaceful. There was no violence or mass picketing, no name-calling, threats or incitement to violence, no physical blocking of entrances and exits or of public passageways. The only possible basis for concluding that the activity is not protected is the finding that "a primary purpose" of the picketing was to induce OCAW member-employees to breach their contract.

In just what sense the trial court used the words, "a primary purpose", is not entirely clear from the findings of fact and conclusions of law, but analysis will make it clear. The word "primary" may mean first in order of time, immediate, or it may mean first in order of rank or importance, principal. In the use of the phrase the trial court obviously referred to the "immediate" purpose, for it goes without saying that the "principal" purpose of the picketing was to exert pressure on American Oil Company and thus to force settlement of the labor dispute between the employer and NMU.

I have found no case by either the federal courts or the N.L.R.B. in which it has been held that the protection afforded by Section 7 does not shield the activity of a labor union representing one group of employees, who have a labor dispute with their employer, in peacefully picketing the employer's place or places of business where other employees, represented by a different bargaining agent and having a no-strike, no-work-stoppage contract, are working. The majority cite no such case and neither

does respondent, The American Oil Company. The cases relied on as persuasive by The American Oil Company fall into two categories. Cases in the first category need not be cited here. They are cases decided by the N.L.R.B. and United States Courts of Appeals which stand for the principle that Section 7 does not protect strikes or picketing by employees in breach of their own no-strike contract. We may accept those decisions as establishing the principle of law for which they stand. If in this case OCAW members had honored NMU's picket line, I would be inclined to say, on the strength of the cited cases, that such activity was not protected. But that is not the issue here. The cases in the second category were decided by state courts and while that fact alone disqualifies them as compelling precedents in my view, they are entitled to closer attention because they are closer to the issue in this case, and the Supreme Court of the United States may regard some state court decisions as compelling precedents. They are: Office Employees International Union, etc. v. Houston Lighting & Power Company, Texas Civ. App., 314 S.W. 2d 315, writ refused, n.r.e.; Cooperative Refinery Association v. Williams, 185 Kan. 410, 345 P. 2d 709; Standard Oil Company v. Oil, Chemical & Atomic Workers Union, Ohio Ct. Common Pleas, 144 N.E. 2d 517; Gulf Refining Company v. Oil Workers International Union, Ohio Ct. Common Pleas, 114 N.E. 2d 534; M & M Wood Working Company v. United Brotherhood of Carpenters and Joiners, Oregon Circuit Ct., 26 Labor Cases 87,545; American Brake Shoe Company v. Machinists Association, 373 Pa. 164, 94 A. 2d 884.

Standard Oil Company v. Oil, Chemical & Atomic Workers, Gulf Refining Company v. Oil Workers International Union, and M & M Wood Working Company v. United Brotherhood of Carpenters and Joiners, were, indeed, suits to restrain and enjoin labor organizations representing the employees of one business of an employer from picketing another place of business of the same employer where the employees of the second business were represented by a different union and had a no-strike contract. In each case the state court granted the relief sought. But these decisions cannot be the type of *compelling* precedents of which *Garmon* speaks. With all due deference, they are decisions of trial courts, apparently the equivalent of our district courts, and all were made before *Garmon*.

American Brake Shoe Company v. Machinists Association was decided by the Supreme Court of Pennsylvania. The employer sought to enjoin representatives of employees of an employer's place of business in St. Louis, Missouri, from picketing the em-

ployer's place of business in Meadville, Pennsylvania, where the employees were represented by a different union and had a no-strike contract. The injunction was denied on the ground that it was prohibited by state statute. The court's statement that jurisdiction to grant relief had not been pre-empted to the N.L.R.B. was strictly a dictum. The court stated that there was no evidence before it that the employer was doing business in interstate commerce and that the question of jurisdiction had not been raised. The decision was also before *Garmon*.

Office Employees International Union v. Houston Lighting & Power Company was decided by the Austin Court of Civil Appeals. Representatives of the Office Employees Union established a picket line at a separate place of business of its employer, where employees were represented by other unions, because of discharge of an employee at the second place of business. State court jurisdiction to enjoin the picketing was upheld by the Court of Civil Appeals on more than one ground, one of which was that the purpose of the picketing was to induce employees at the second place of business to breach their no-strike contract in violation of Article 5154d. Our refusal of writ of error, no reversible error, did not constitute approval of that holding. Moreover, this is also a pre-Garmon decision.

Cooperative Refinery Association v. Williams is a post-Garmon decision by the Supreme Court of Kansas. The court upheld jurisdiction of the state courts to enjoin peaceful picketing over protest that the picketing was either protected by Section 7 or prohibited by Section 8. The Teamsters Union, representatives of employees of Consumers Cooperative Association, a Kansas corporation with its office and place of business in Kansas City, Missouri, established a picket line at the place of business in Lawrence, Kansas, of The Cooperative Farm Chemicals Association, also a Kansas corporation, whose employees were represented by Oil, Chemical and Atomic Workers Union. Consumers Cooperative Association owned 75% of the stock of The Cooperative Farm Chemicals Association and the same individual was president of both corporations. The court held that the picketing was not protected because there was no evidence that the first corporation controlled the second or even that they were doing business with each other. That finding is the exact opposite of the finding in the case before us. The Kansas court held that the picketing was not prohibited because the picketing union "had no intention of inducing, encouraging or persuading such employees [of the second corporation] to engage in any concerted or other activity * * *." Here, again, the finding is the exact

opposite of the finding in the case at bar. While this case can hardly be persuasive in deciding the merits of the issue before us, it does support jurisdiction of the state courts to decide it.

One other state decision deserves mention although it cannot be regarded as of controlling significance. In Dooley v. Anton, 8 N.Y. 2d 91, 168 N.E. 2d 356, decided after second *Garmon*, the New York Court of Appeals held that the effect of the Garmon decision was to oust jurisdiction of state courts to enjoin picketing for the purpose of coercing the employer into breaching his contract with another union which represented a majority of his employees. The Court concluded that *Garmon* required that primary jurisdiction to decide whether the activity was protected or prohibited be left to the N.L.R.B. The court overruled an earlier decision that the identical activity was neither protected nor prohibited and that the state courts therefore had jurisdiction to enjoin it. The opinion is weakened by the fact that at the time the court decided the case the LMRA had been amended to make recognition picketing an unfair labor practice, thus expressly bringing regulation of the activity within the exclusive jurisdiction of the N.L.R.B.

It seems quite clear to me that the District Court was without jurisdiction to grant the temporary injunction if its jurisdiction is tested by the opinion of the majority in second *Garmon*. I am also satisfied that the court was without jurisdiction if its jurisdiction is tested by the opinion of the concurring Justices. The sense of the concurring opinion, as I understand it, is that when it is clear *to a state court* that an activity is neither protected nor prohibited by the LMRA the court should be permitted to take jurisdiction to control the activity, subject to review of the correctness of its determination by the Supreme Court of the United States, even though the question has not been submitted to or decided by the N.L.R.B. The concurring Justices joined in approving the Court's judgment in second *Garmon* solely because it was "fairly debatable" whether the conduct involved was protected. On the basis of the decisions reviewed above, I would be forced to conclude that it is fairly debatable whether the picketing by NMU is prohibited and also fairly debatable whether it is protected. Thus I would be forced to conclude here, as did the concurring Justices in *Garmon,* that the District Court was without jurisdiction to grant the injunction. Particularly would I be compelled to do so considering that The American Oil Company had a remedy to protect itself against harm by obtaining a state court injunction against breach by OCAW member-employees of their no-strike, no-work-stoppage contract.

Teamsters Union v. Lucas Flour Company, 82 S.Ct. 571, 7 L. Ed. 2d 593; Dowd Box Co. v. Courtney, 7 L. Ed. 2d 483; McCarroll v. Los Angeles Dist. Council of Carpenters, etc., 49 Cal. 2d 45, 315 P. 2d 322; McLean Distributing Co. v. Brewery and Beverage Drivers, etc., 254 Minn. 204, 94 N.W. 2d 514; Philadelphia Marine Trade Ass'n. v. International Longshoremen's Ass'n., etc., 382 Pa. 326, 115 A. 2d 733.

It seems clear to me that late decisions of the Supreme Court of the United States in labor cases indicate two definite trends. These trends are noticed also by Jeffers in his article in 36 T.L.R. 938. The first trend is represented by such cases as International Brotherhood of Teamsters v. Vogt, 354 U.S. 284, 77 S. Ct. 1166, 1 L. Ed. 2d 1347, and is toward a broadening of the power of the states to curb peaceful labor activity against employers in intrastate business when the activity violates basic public policy of the states, whether the policy be enunciated by the state legislature or by the judiciary. The process is one of limiting the broad sweep of such cases as Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L. Ed. 1093, in the protection of the constitutional guaranty of free speech. It is in this field that the *purpose* of the activity is of all-controlling importance. The second trend is represented by such cases as the two *Garmon* decisions and is toward a narrowing of the jurisdiction of state courts to curb or control peaceful labor activity against employers in interstate business. The process is one of excluding state jurisdiction in this field until the N.L.R.B. has first made a definitive determination that the activity is neither protected nor prohibited by the Labor Management Relations Act or until the Supreme Court has decided the same issue in a case properly before it. In this area the *purpose* of the activity is not of such major consequence, at least until the question of jurisdiction of the activity has been determined to be in the courts. Cases decided by the Supreme Court since second *Garmon* confirm this latter trend. See Hotel Employees v. Sax Enterprises, 358 U.S. 270, 79 S.Ct. 273, 3 L. Ed. 2d 289; Plumbers, etc. v. County of Door, 359 U.S. 354, 79 S.Ct. 844, 3 L. Ed. 2d 872. It was recognized by this Court in Ex Parte Twedell, 158 Texas 214, 309 S.W. 2d 834, in which we held the state courts were without jurisdiction to enjoin peaceful picketing even though the purpose was to bring about a violation of state right to work laws.

Relator should be discharged.

ASSOCIATE JUSTICE NORVELL joins in this dissent.

Opinion delivered May 30, 1962.